ERNESTINE DEMERY, Employee, Plaintiff v. PERDUE FARMS, INC., Employer; SELF-INSURED/CRAWFORD & COMPANY, Servicing Agent, Defendant

No. COA00-41

(Filed 1 May 2001)

**Workers' Compensation— disability—capacity to work in any employment—sufficiency of evidence**

A workers' compensation permanent total disability award was reversed where the record did not contain evidence showing that pain from plaintiff's carpel tunnel syndrome rendered her incapable of work in any employment (and no evidence was presented on the three alternative methods of showing a disability). Evidence of pain from a compensable injury must show that plaintiff is incapable of work in any employment to support a conclusion of disability and receiving payments from an employer funded disability plan is not evidence of disability within the meaning of the Workers' Compensation Act unless plaintiff was incapable of earning in any employment the wages she had earned before the injury.

Judge HUDSON dissenting.

Appeal by defendant from opinion and award of the North Carolina Industrial Commission filed 19 November 1999. Heard in the Court of Appeals 13 February 2001.

*Daniel F. Read for plaintiff-appellee.*

*Haynsworth Baldwin Johnson & Greaves LLC, by Brian M. Freedman, for defendant-appellant.*

GREENE, Judge.

Defendant Perdue Farms, Inc. (Perdue) appeals an opinion and award of the Full Commission of the North Carolina Industrial Commission (the Commission) filed 19 November 1999 awarding Ernestine Demery (Plaintiff) permanent total disability compensation.

The record shows that at the time of her workers' compensation hearing, Plaintiff had been working for Perdue for thirteen years. Plaintiff testified her job with Perdue was the only job she had ever had. In 1992, Plaintiff's employment duties consisted of "hanging birds on the line." During this time period, Plaintiff began experiencing pain and numbness in her hands and arm, which she reported to Perdue. Perdue instructed Plaintiff to see Josephus Bloem, M.D. (Dr. Bloem), who diagnosed Plaintiff as having carpal tunnel syndrome in both of her hands. Plaintiff received medical treatment from Dr. Bloem, including an injection in one of her hands and prescription medication; however, she continued to experience pain in her arm, shoulder, and neck. In addition, Plaintiff could "hardly sleep at night" because of pain in her hands. In 1993, Plaintiff was seen by Thomas Bergfield, M.D. (Dr. Bergfield). At that time, she complained of pain related to carpel tunnel syndrome and she informed Dr. Bergfield that she had difficulty sleeping.

In 1995, Plaintiff's job duties at Perdue were changed to working "on the giblet machines." Working on the giblet machines required Plaintiff to use her hands to pick up hearts, gizzards, necks, and livers and place them into "slot[s]." This work required continuous use of Plaintiff's hands and Plaintiff testified that as a result of this work her hands "were hurting" and she experienced cramping in one of her hands. Plaintiff reported these problems to Perdue.

In February 1996, Perdue sent Plaintiff to see Robert Hansen, M.D. (Dr. Hansen), a board certified physician in neurology and clinical neurophysiology. Dr. Hansen worked on a contract basis with Perdue. After Dr. Hansen performed diagnostic testing on Plaintiff, including EMG tests, he diagnosed Plaintiff as having carpel tunnel syndrome and fibromyalgia which is "a syndrome in which people have pain in the axial muscles." Based on comparisons of EMG tests performed on Plaintiff in 1992 and 1996, Dr. Hansen determined there had been "some improvement" in Plaintiff's carpal tunnel syndrome and her condition was "not getting any worse." He testified the treatment Plaintiff had undergone prior to that time, which included mod-

DEMERY v. PERDUE FARMS, INC.

[143 N.C. App. 259 (2001)]

ifying her work duties, was "successful in arresting the course of the illness." Dr. Hansen continued to treat Plaintiff by means of modifying her job duties, including rotating Plaintiff to various jobs and eliminating repetitive activities such as using knives and scissors. He also treated her with the use of medications and splints.

Dr. Hansen examined Plaintiff for a second time in April 1996 and Plaintiff complained at that time of pain in her wrists and forearm. Dr. Hansen determined Plaintiff's carpel tunnel syndrome was "stable" and "the pain she was having in her forearm was from tendonitis." Dr. Hansen prescribed anti-inflammatory medication to treat the tendonitis. In Dr. Hansen's opinion, Plaintiff was able to continue working with the previously recommended modifications. Dr. Hansen saw Plaintiff for follow-up visits in July 1996 and September 1996. Dr. Hansen believed there was "improvement" in Plaintiff's carpel tunnel syndrome at the time of the September visit, and he attributed this improvement to job modifications, medication, and the use of splints. In December 1996, Dr. Hansen prescribed physical therapy for Plaintiff with Bruce Tetalman, M.D. (Dr. Tetalman). After examining Plaintiff, Dr. Tetalman assigned permanent partial disability ratings of 7% to "both of [her] upper extremities."

When Dr. Hansen examined Plaintiff in 1997, he determined, based on EMGs performed on Plaintiff, that her carpel tunnel syndrome was continuing to improve. He believed her condition was "adequately managed with frequent job rotations and proper use of medications." In February 1998, Dr. Hansen examined Plaintiff and determined that with job modifications she was able to continue working at Perdue. He testified that although he believed Plaintiff had some pain, "[t]here was nothing that [he] saw in [her] that would have disqualified her from doing some sort of modified productive job at the plant." Dr. Hansen examined Plaintiff again in May 1998 and July 1998, and he did not believe at either of these times that there were any medical reasons Plaintiff was unable to work. Dr. Hansen testified he told Plaintiff that if " 'the mere fact of working in the plant produces all the pains' " that Plaintiff complained of, "then an option would be to stop working and to pursue Social Security Disability." When asked by Plaintiff's counsel whether it was "reasonable" for Plaintiff to decide at some point that she could no longer work, Dr. Hansen responded:

> I do not fault her for making that decision. . . . I would never tell somebody . . . they should do something that hurts them. But if you . . . ask me if there's a . . . medical reason why somebody

could not do the job, I'd have to say no. But I certainly have sympathy for the fact that she felt that it was uncomfortable enough for her that she no longer wanted to work.

Daniel Lee, M.D. (Dr. Lee), a board certified physician in neurology, psychiatry, and sleep disorder medicines, testified he examined Plaintiff on 30 May 1997. Dr. Lee testified he would recommend the following job restrictions for someone with Plaintiff's medical conditions: avoidance of duties requiring repetitive movement and avoidance of performing the same task for more than twenty minutes. Dr. Lee suggested such an employee should work in a position with rotating duties or, in the alternative, take a break for up to twenty minutes. Dr. Lee classified Plaintiff's carpel tunnel syndrome "as moderate to severe range." Dr. Lee stated that assuming Plaintiff's job duties at Perdue did not require repetitive motion or heavy lifting, she would have been capable of performing her job duties in 1997.

Fred Clark, Jr. (Clark) testified he was Plaintiff's supervisor at Perdue in 1998. At that time, Plaintiff's job title was "[g]iblet service." Clark was aware of Plaintiff's medical restrictions and her duties at Perdue complied with those restrictions. Clark described Plaintiff's duties as "doing hourly checks" on wrap, performing "temperature checks," and "putting livers in a cup." When Plaintiff was not performing these duties, "[t]here may [have been] some point in time that she . . . stood up there [against the wall] and . . . [did not do] very much."

In February 1998, Plaintiff went to see Meredith R. Anthony, M.D. (Dr. Anthony), who was Plaintiff's family physician. Plaintiff testified that at that time her job duties consisted of "odd-jobs" and she was unable to perform any "steady" job. Plaintiff testified Dr. Anthony "took [her] out of work because [she] told him [she] was hurting." Dr. Anthony did not testify and Plaintiff did not present evidence of her medical records from Dr. Anthony. The record, however, does contain copies of several notes signed by Dr. Anthony excusing Plaintiff from work. A note dated 6 March 1998 states, "[Plaintiff] will be unable to return to her previous work environment involving repetitive motion and cold exposure and should continue to refrain from these." Additionally, a note dated 5 May 1998 states Plaintiff "should continue to avoid repetitive motion, cold exposure and exacerbating activities."

Plaintiff stopped reporting to work on 7 February 1998. In March 1998, Plaintiff received a letter from Perdue notifying her that she

DEMERY v. PERDUE FARMS, INC.

[143 N.C. App. 259 (2001)]

would be terminated if she did not return to work. Plaintiff testified that she returned to work; however, she was told to "go home" when she refused to leave the medication she had received from Dr. Anthony at the front desk while she was working. Plaintiff's last date of work with Perdue was in March 1998.

Subsequent to Plaintiff's hearing, the Commission made the following pertinent findings of fact:

1. At the time of the hearing, . . . [P]laintiff was a thirty-two year old high school graduate . . . .

. . . .

14. On 1 April 1997, Dr. Tetalman found [P]laintiff to be at maximum medical improvement and rated . . . [P]laintiff as retaining a seven percent permanent partial impairment rating to each of her upper extremities.

. . . .

18. On 2 February 1998, Dr. Hansen told [P]laintiff that her duties at the plant were minimal and he could not conceive of how they could be made any lighter. He further stated that if the job caused her so much pain, she had the option of stopping work and pursuing Social Security Disability.

19. . . . [P]laintiff last worked for [Perdue] on 7 February 1998. In March of 1998, [Perdue] sent [P]laintiff a letter to return to work. However, when [P]laintiff returned to work with medications prescribed by Dr. Anthony, she was sent home. She did not return to work after that incident. She was unable to work because of the accepted carpel tunnel syndrome superimposed on fibromyalgia. She received short-term disability through an employer-funded plan . . . for twenty-six weeks.

20. On 23 April 1998, an EMG showed continuing carpel tunnel syndrome with no significant worsening, although [P]laintiff was still presenting with pain and swelling. Dr. Hansen further opined that on the modified duty, [P]laintiff's carpel tunnel condition had stabilized and he did not believe anything further could be done for her.

. . . .

23. Due to [P]laintiff's accepted compensable carpel tunnel syndrome superimposed on fibromyalgia, [P]laintiff is unable to

earn wages. This condition is not likely to improve and is likely to be permanent. Payment of disability under the company's disability income plan is also evidence of inability to earn wages.

24. Plaintiff is disabled by constant and debilitating pain. Dr. Hansen could not disagree with that and would not criticize her decision to stop working as of February 1998. Dr. Anthony has approved her medical absence from work. . . .

The Commission then concluded as a matter of law: "[P]laintiff is entitled to permanent total disability compensation at the rate of $200.01 per week from February 7, 1998, since she is unable to earn wages because of her compensable carpal tunnel syndrome and its interactions with fibromyalgia."

---

The dispositive issue is whether the Commission's finding of fact that "[d]ue to [P]laintiff's accepted compensable carpal tunnel syndrome superimposed on fibromyalgia, [P]laintiff is unable to earn wages" is supported by competent evidence.

Appellate review of a decision of the Commission is limited to whether the record contains competent evidence to support the Commission's findings of fact, and whether the findings of fact support the Commission's conclusions of law. *Hemric v. Manufacturing Co.*, 54 N.C. App. 314, 316, 283 S.E.2d 436, 437-38 (1981), *disc. review denied*, 304 N.C. 726, 288 S.E.2d 806 (1982).

"Disability," within the meaning of the of the North Carolina Workers' Compensation Act, is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C.G.S. § 97-2(9) (1999). To show the existence of a disability under this Act, an employee has the burden of proving:

(1) that [she] was incapable after [her] injury of earning the same wages [she] had earned before [her] injury in the same employment, (2) that [she] was incapable after [her] injury of earning the same wages [she] had earned before [her] injury in any other employment, and (3) that [her] incapacity to earn was caused by [her] injury.

*Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982). The employee may meet her initial burden of production by producing:

(1) . . . medical evidence that [she] is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) . . . evidence that [she] is capable of some work, but that [she] has, after a reasonable effort on [her] part, been unsuccessful in [her] effort to obtain employment; (3) . . . evidence that [she] is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) . . . evidence that [she] has obtained other employment at a wage less than that earned prior to the injury.

*Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (citations omitted). Once an employee meets her initial burden of production, the burden of production shifts to the employer to show "that suitable jobs are available" and that the employee is capable of obtaining a suitable job "taking into account both physical and vocational limitations." *Kennedy v. Duke Univ. Med. Center*, 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990). The burden of proving a disability, however, remains on the employee. *Hilliard*, 305 N.C. at 595, 290 S.E.2d at 683. Whether a disability exists is a question of law. *Id.*

In this case, the Commission found as fact that "[d]ue to [P]laintiff's accepted compensable carpal tunnel syndrome superimposed on fibromyalgia, [P]laintiff is unable to earn wages." Initially, we note the Commission did not make any findings of fact that Plaintiff is unable to earn wages *in any employment. See Russell*, 108 N.C. App. at 765, 425 S.E.2d at 457. Nevertheless, assuming the Commission did make such a finding, the issue before this Court is whether the record contains competent evidence to support such a finding. The record contains evidence Plaintiff suffered from pain as a result of her carpel tunnel syndrome while working for Defendant. Although evidence a plaintiff suffers from pain as a result of her compensable injury may be competent evidence to support a conclusion the plaintiff is disabled, *see Niple v. Seawell Realty & Insurance Co.*, 88 N.C. App. 136, 139, 362 S.E.2d 572, 574 (1987) (plaintiff's degree of pain may be considered when determining whether he or she is capable of work), *disc. review denied*, 321 N.C. 244, 365 S.E.2d 903 (1988), the evidence must show that pain renders the plaintiff incapable of work in any employment, *see, e.g., Errante v. Cumberland County Solid Waste Management*, 106 N.C. App. 114, 118, 415 S.E.2d 583, 585-86 (1992) (plaintiff's testimony he suffered from excessive pain, in conjunction with his physician's testimony plaintiff could not " 'do any kind of

gainful employment at this time, under any light duty of any kind' " is competent evidence plaintiff is permanently and totally disabled). In the case *sub judice*, the record does not contain any such evidence.[1] Plaintiff did not present any evidence from a medical doctor or vocational specialist that she is unable to work in any employment.[2] Additionally, Plaintiff did not testify she was incapable as a result of her pain of working in any employment. Moreover, evidence Plaintiff had a 7% permanent partial impairment rating on her upper extremities and that she had job restrictions is not medical evidence Plaintiff has a permanent total disability. *See Demery v. Converse, Inc.*, 138 N.C. App. 243, 250-52, 530 S.E.2d 871, 876-77 (2000) (evidence plaintiff had a 20% partial impairment to his back and evidence plaintiff had permanent work restrictions insufficient to support conclusion plaintiff suffered a permanent total disability); *Royce v. Rushco Food Stores, Inc.*, 139 N.C. App. 322, 331-32, 533 S.E.2d 284, 290 (2000) (Commission's findings of fact that " 'plaintiff is not capable of working in a job that requires standing from eight to ten hours a day,' " that plaintiff could " 'perform a seated job if she can keep her leg elevated most of the time,' " and that plaintiff " 'made no effort to find alternative employment within her restrictions after she reached maximum medical improvement' " support the Commission's conclusion plaintiff did not meet burden of showing it would be futile for her to seek other employment); *Bridges v. Linn-Corriher Corp.*, 90 N.C. App. 397, 400-01, 368 S.E.2d 390-91 (evidence plaintiff was 61 years old with a fifth grade education, that he was skilled only in work that he was physically unable to perform, that he was afflicted with an easily aggravated breathing condition, and that he attempted but was unable to obtain employment is sufficient to show plaintiff has an impaired earning capacity), *disc. review denied*, 323 N.C. 171, 373 S.E.2d 104 (1988). Finally, evidence Plaintiff received payments pursuant to an employer-funded disability plan is not evidence Plaintiff is disabled within the meaning of the Workers' Compensation Act

1. Pursuant to *Russell*, Plaintiff could also meet her burden of production by presenting evidence: she is capable of some work but that after a reasonable effort on her part she has been unable to obtain employment; she is capable of some work but that because of pre-existing conditions, it would be futile for her to seek employment; or she has obtained other employment at a wage less than that earned prior to the injury. Plaintiff, however, did not present any evidence regarding these three alternative methods of showing a disability; thus, we do not address these alternative methods.

2. The dissent states Dr. Anthony's notes excusing Plaintiff from work with Defendant are competent evidence to support a finding Plaintiff was unable to work in any employment. We disagree. Dr. Anthony's notes, stating Plaintiff should not work in a position requiring repetitive motion or exposure to the cold, do not support a finding Plaintiff was unable to work in *any* employment.

unless the evidence shows those payments were made because Plaintiff was incapable, due to her carpel tunnel syndrome, of earning wages she had earned before this injury in the same or any other employment. Accordingly, the 19 November 1999 opinion and award of the Commission is reversed.

Because we reverse the opinion and award of the Commission, we need not address Perdue's additional assignments of error.

Reversed.

Judge McCULLOUGH concurs.

Judge HUDSON dissents.

HUDSON, Judge, dissenting.

I believe that the cases from the Supreme Court and from this Court addressing our role in reviewing the findings of the Industrial Commission, the plaintiff's burden in establishing disability, and the defendant's burden of proof in response, require us to affirm the Award of the Commission here. Therefore, I must dissent.

First, I do not believe that the standard of review as it is set forth in the majority opinion fully articulates the limited role of this Court in reviewing decisions of the Industrial Commission, as recently clarified by our Supreme Court. In *Adams v. AVX Corp.*, 349 N.C. 676, 509 S.E.2d 411 (1998), the Supreme Court stated the following regarding the role of the reviewing Court with respect to findings of the Industrial Commission:

"The findings of fact by the Industrial Commission are conclusive on appeal if supported by any competent evidence." *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977). Thus, on appeal, this Court "does not have the right to weigh the evidence and decide the issue on the basis of its weight. The court's duty goes no further than to determine whether the record contains any evidence tending to support the finding." *Anderson [v. Lincoln Constr. Co.]*, 265 N.C. at 434, 144 S.E.2d at 274.

N.C.G.S. § 97-86 provides that "an award of the Commission upon such review, as provided in G.S. 97-85, shall be conclusive and binding as to all questions of fact." N.C.G.S. § 97-86 (1991). As we stated in *Jones v. Myrtle Desk Co.*, 264 N.C. 401, 141 S.E.2d 632

(1965), "[t]he findings of fact of the Industrial Commission are conclusive on appeal when supported by competent evidence, even though there be evidence that would support findings to the contrary." *Id.* at 402, 141 S.E.2d at 633. *The evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence. Doggett v. South Atl. Warehouse Co.*, 212 N.C. 599, 194 S.E. 111 (1937).

*Id.* at 681, 509 S.E.2d at 414 (emphasis added). Applying these principles to the case before us, I believe that we are bound by the findings of the Commission—because the evidence supports these findings—and that the findings support the conclusions.

As the majority has noted, this Court has identified four ways in which a plaintiff may satisfy her initial burden of establishing the existence of a disability. *See Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). According to the *Russell* court, one route of proving disability is by coming forth with medical evidence that the individual is physically or mentally, as a consequence of the work-related injury, incapable of work in any employment. *See id.* The Commission in this case specifically made the following findings:

> 23. Due to plaintiff's accepted compensable carpal tunnel syndrome superimposed on fibromyalgia, plaintiff is unable to earn wages. This condition is not likely to improve and is likely to be permanent. Payment of disability under the company's disability income plan is also evidence of inability to earn wages.

> 24. Plaintiff is disabled by constant and debilitating pain. Dr. Hansen could not disagree with that and would not criticize her decision to stop working as of February 1998. Dr. Anthony has approved her medical absence from work. Plaintiff's carpal tunnel syndrome is part of this complex, along with fibromyalgia. Plaintiff's compensable occupational disease, carpal tunnel syndrome, in combination with her other medical problems, including fibromyalgia, now renders her effectively totally disabled and entitled to benefits under N.C. Gen. Stat. § 97-29.

The Commission further concluded that "plaintiff is entitled to permanent total disability compensation . . . since she is unable to earn wages because of her compensable carpal tunnel syndrome and its interactions with fibromyalgia." The medical evidence certainly

supports the Commission's findings that plaintiff's physical condition, combined with her pain, have rendered her unable to perform even the minimal duties of her last job, which the Commission found to be "make work." Furthermore, plaintiff's perception of "debilitating pain," with which her doctors could not disagree, in combination with her diagnosed physical conditions found by the Commission, constitute medically-documented "physical or mental" consequences of her occupational disease which render plaintiff incapable of work in any employment. Viewing the evidence in the light most favorable to plaintiff, and giving plaintiff the benefit of every reasonable inference to be drawn from that evidence, I believe the evidence supports the finding that plaintiff has established her disability pursuant to the first method in *Russell*.

Further, in support of these findings are documents from the defendant's own medical file on plaintiff. Contained therein are several "Medical Information Forms" showing that plaintiff was suffering from carpal tunnel syndrome, and that her carpel tunnel syndrome worsened and required increasing restrictions—meaning less strenuous duties—until plaintiff was unable to perform any meaningful job duties at all. The record reflects, and the Commission found, that she last actually worked on 7 February 1998. The defendant's medical file also contains notes, submitted in support of plaintiff's request for disability pay, dated 2/6/98, 3/6/98, 4/6/98 and 5/5/98 and signed by Dr. Anthony. These notes indicate that plaintiff should be excused from work because of increasing pain from her tendinitis and arthritis exacerbation, among other physical conditions. For example, three of the four notes state as follows:

> 2/6/98—Ms. Demery was seen in clinic today with worsening arm, back & knee pain due to tendonitis and osteoarthritis exacerbation. She should rest home until she improves (anticipate two-to-four weeks). Please excuse absences 2/8/98-3/8/98, inclusive?

> 3/6/98—Ms. Demery was seen in clinic follow-up today without any subjective improvement in pain in her hands, arms, back and left knee, despite meds and rest. She was unable to followup with neurology as directed due to financial constraints. She will be unable to return to her previous work environment involving repetitive motion and cold exposure and should continue to refrain from these. She will likely require rheumatology or orthopedic consultation. Please excuse absences from work? Return date is indeterminate.

5/5/98—Ms. Demery was seen today in clinic followup with persistent pain complaints bilateral hands and stiffness right side and upper extremity swelling. She has severe carpal tunnel syndrome and fibromyalgia and should continue to avoid repetitive motion, cold exposure and exacerbating activities. Please excuse absences from work? Return date is undetermined.

These notes were the basis for the approval of her application for disability benefits, which was also filled out and signed by Dr. Anthony, indicating that "Patient has been continuously disabled from work" since 8 February 1998. Accordingly, there is plentiful medical evidence to support the findings of the Commission that the plaintiff had proved her disability and had been continuously unable to earn wages since her last date of work.

Once plaintiff has proved her disability, as the Commission found in this case, the burden shifts to the employer to establish wage-earning capacity. In *Saums v. Raleigh Community Hospital*, 346 N.C. 760, 487 S.E.2d 746 (1997), the Supreme Court explained at length the concepts which come into play in the determination of whether a defendant-employer, by providing a modified job to the plaintiff, has satisfied its burden of proving the plaintiff has regained wage-earning capacity. In *Saums*, the plaintiff sustained a back injury, underwent surgery twice, and received benefits following the entry and approval of a Form 21. The plaintiff returned to work at a modified light duty job ("quality control clerk") for more than a year, and then left her job with increased pain. After several months, the plaintiff underwent surgery a third time, at which point her benefits resumed. At the end of her recovery from the third surgery, her physician released her to return to the modified job, stating that he could not "find any hard reason why this patient should not be allowed to return to the job that was created by you which would eliminate any strenuous activities." She declined to return to the job and the defendant refused to restart her weekly benefits.

The Supreme Court held that the plaintiff was cloaked in the presumption of ongoing disability by virtue of the Form 21 agreement. *See id.* at 763, 487 S.E.2d at 749. "After the presumption attaches, 'the burden shifts to [the employer] to show that plaintiff is employable.' " *Id.* (quoting *Dalton v. Anvil Knitwear*, 119 N.C. App. 275, 284, 458 S.E.2d 251, 257, *disc. review denied and cert. denied*, 341 N.C. 647, 462 S.E.2d 507 (1995)). The Supreme Court went on to explain that:

The employee need not present evidence at the hearing unless and until the employer, "claim[ing] that the plaintiff is capable of earning wages[,] . . . come[s] forward with evidence to show not only that suitable jobs are available, but also that the plaintiff is capable of getting one, taking into account both physical and vocational limitations."

*Id.* at 763-64, 487 S.E.2d at 749 (quoting *Kennedy v. Duke Univ. Med. Center,* 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990)). The Court then held that the defendant's evidence of an available job, created for and offered to the plaintiff, and within plaintiff's physical limitations, did not rebut the presumption of disability, since this "modified job" was not an accurate reflection of the plaintiff's earning ability in the competitive marketplace, and since there was no evidence that any employer other than the defendant would hire the plaintiff at that wage. *See id.* at 764-65, 487 S.E.2d at 750. Quoting its previous decision in *Peoples v. Cone Mills,* 316 N.C. 426, 342 S.E.2d 798 (1986), the *Saums* court explained why the evidence was insufficient to establish wage-earning capacity:

If the proffered employment does not accurately reflect the person's ability to compete with others for wages, it cannot be considered evidence of earning capacity. Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level. The same is true if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market. The rationale behind the competitive measure of earning capacity is apparent. If an employee has no ability to earn wages competitively, the employee will be left with no income should the employee's job be terminated. . . .

[T]he Workers' Compensation Act does not permit [defendant] to avoid its duty to pay compensation by offering an injured employee employment which the employee under normally prevailing market conditions could find nowhere else and which [defendant] could terminate at will or, as noted above, for reasons beyond its control.

*In this case, it has not been established that the quality control clerk position offered to plaintiff is an accurate measure of plaintiff's ability to earn wages in the competitive job market. There is no evidence that employers, other than de-*

*fendant, would hire plaintiff to do a similar job at a comparable wage.*

*Saums,* 346 N.C. at 764-65, 487 S.E.2d at 750 (internal quotation marks and citations omitted) (emphasis added).

There is no meaningful distinction between the evidence presented here and the evidence presented in *Peoples* or *Saums,* and the Commission here correctly held that the modified job held by plaintiff until 7 June 1998 did not reflect any ability to earn wages. The defendant's argument that the "duties" performed by the plaintiff in her last modified job (in which her supervisor testified that at times plaintiff "stood around and did not do very much") is nearly identical to the argument which was rejected by the Supreme Court in *Saums.*

We are required by *Adams* to view the evidence in the light most favorable to plaintiff and to give plaintiff the benefit of every reasonable inference that may be drawn from the evidence. Pursuant to this standard of review, I believe the evidence fully supports the Commission's findings and conclusions that plaintiff has no wage-earning capacity, that plaintiff was entitled to a presumption of ongoing disability, and that defendant failed to come forward with evidence to overcome the presumption of ongoing disability once it arose. Therefore, I vote to affirm.