***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. An employer-employee relationship existed between plaintiff and defendants.
5. Plaintiff sustained a compensable injury on October 15, 1999.
6. Plaintiff was paid for the entire day of the incident.
7. Defendants have paid $40,333 in indemnity benefits for the period December 13, 1999 through June 6, 2001 pursuant to a Form 60 dated January 28, 2000.
8. Defendants have paid $8,976 in medical expenses through May 29, 2001.
9. Documents stipulated into evidence by the parties at the hearing before the Deputy Commissioner include the following:
a. Stipulated Exhibit #1 Plaintiff's medical records
b. Stipulated Exhibit #2 Medical rehabilitation records
c. Stipulated Exhibit #3 Industrial Commission Forms
10. Plaintiff submitted the following exhibits which were admitted into evidence at the hearing before the Deputy Commissioner:
a. Plaintiff's Exhibit 1 — Social Security Administration award letter
b. Plaintiff's Exhibit 2 — Operation Manager job description
c. Plaintiff's Exhibit 3 — plaintiff's pay stubs
 d. Plaintiff's Exhibit 4 — out of work notes from Carolina Bone and Joint
 e. Plaintiff's Exhibit 5 — copies of plaintiff's summary of accident and letter dated November 22, 1999.
11. Defendant submitted the following exhibit which was admitted into evidence at the hearing before the Deputy Commissioner:
a. Plaintiff's Answers to First Set of Interrogatories
12. The issues to be determined by the Commission are as follows:
 a. Is plaintiff entitled to continuing temporary total disability benefits;
b. Is plaintiff permanently and totally disabled;
c. Did plaintiff unjustifiably refuse suitable employment;
 d. Is plaintiff at maximum medical improvement; if so, is she entitled to a permanent partial disability rating;
 e. If plaintiff has continuing disability, is it due to medical conditions unrelated to plaintiff's injury by accident;
f. What is plaintiff's correct average weekly wage; and
 g. Are defendants entitled to a credit of payment of temporary total disability benefits after plaintiff was released to return to work on March 14, 2000.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACTS
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 37 years old. Plaintiff graduated from high school and completed several years of college classes. She worked in the financial or mortgage field for many years.
2. On October 15, 1999, plaintiff was employed as operations manager for Crossland Mortgage, a part of First Security Corporation. Plaintiff had been Branch Manager at the Charlotte location from January 1, 1999 to September 7, 1999, at which time she was offered the operations manager position for two Charlotte locations of Crossland Mortgage. Her position change was due to poor performance of the Charlotte location she managed during her eight months as branch manager.
3. On October 15, 1999, plaintiff was moving several boxes while searching for a check and injured her back.
4. Defendants were notified by plaintiff of her injury by accident on November 22, 1999 and filed a Form 19 with the Industrial Commission on January 6, 2000. Defendants accepted plaintiff's claim by filing a Form 60 on January 28, 2000 and have paid continuing disability compensation to plaintiff since December 13, 1999 at a weekly rate of $466.69.
5. On October 18, 1999, plaintiff saw Dr. Nicholas B. Tuttle, with Rock Hill Family Practice. On that date, Dr. Tuttle noted that plaintiff had a history of low back pain with some right sacroiliac pain intermittently over the past year. Dr. Tuttle wrote plaintiff out of work for two days.
6. On October 19, 1999, plaintiff began treating with Dr. Shilpesh S. Patel with Carolina Cardiology Associates where over the next sixteen months she sought treatment for high blood pressure, depression, fatigue, colds, and a number of medical problems unrelated to her work injury. Dr. Patel saw plaintiff seventeen times between October 19, 1999 and February 9, 2001, primarily to monitor plaintiff's blood pressure. Dr. Patel noted on each of his visits with plaintiff she was in no acute distress. Dr. Patel did not relate plaintiff's blood pressure problems to her back injury in his records, and he was not deposed.
7. On October 20, 1999, Dr. James N. Rentz, Jr., with Miller Orthopedic Clinic, Inc., in Rock Hill, South Carolina saw plaintiff upon referral by Dr. Tuttle. Dr. Rentz examined plaintiff for complaints of lower back pain which she described as mostly on the right side over the SI joint and some occasional numbness in the posterior right thigh. Dr. Rentz noted plaintiff had pain off and on since February 1999, but her pain increased over the last few months. Dr. Rentz saw plaintiff only once.
8. On November 17, 1999, plaintiff consulted with Dr. Dennis M. Gettlefinger with Metrolina Neurological Associates, P.A., upon referral by Dr. Tuttle for a second opinion regarding plaintiff's pain and numbness. Plaintiff described discomfort related to removal of uterine fibroids on November 5, 1999. Dr. Gettlefinger later wrote to Dr. Tuttle and indicated that plaintiff's cervical MRI and lumbar MRI were normal, but that she continued to have complaints of burning back pain and numbness in the upper and lower limbs. Dr. Gettlefinger was unable to provide a precise explanation for plaintiff's symptoms and felt that plaintiff's physical exam was essentially normal.
9. Plaintiff last worked for defendant-employer on November 5, 1999. She was on approved leave under the Family Medical Leave Act from November 5, 1999 to December 17, 1999 and from March 27, 2000 to May 4, 2000. She applied for leave under this Act from May 5, 2000 to June 20, 2000 which was denied by defendants because plaintiff had used the maximum amount of leave allowed under the Act.
10. On December 9, 1999, plaintiff returned to Dr. Tuttle with complaints of continued back pain with paresthesias of her hands and a burning pain in her thigh. Dr. Tuttle noted that plaintiff received an SI joint injection with no improvement from Dr. Rentz in October 1999 and that she had a normal MRI scan of her neck and low back. Dr. Tuttle indicated that plaintiff continued to complain of problems and requested a referral to a specialist in Charlotte. Dr. Tuttle's diagnosis of plaintiff was hypertension, neck and back pain with paresthesias, etiology unclear, with negative neurological work up at this time, URI with history of allergic rhinitis in the past, fibroid uterus status-post recent conservative surgery, obesity, and situational stress. Dr. Tuttle referred plaintiff to Dr. Alfred L. Rhyne, III, an orthopedist with Charlotte Orthopedic Specialists.
11. On December 13, 1999, plaintiff first treated with Dr. Rhyne. Dr. Rhyne's notes indicate that plaintiff was not working. Dr. Rhyne noted that plaintiff had been diagnosed with SI joint dysfunction and had a steroid injection into her SI joint without any alleviation of symptoms. Dr. Rhyne's records of his examinations of plaintiff in February 2000 note that plaintiff's orthopedic condition was normal.
12. Defendants contacted plaintiff by correspondence dated January 31, 2000, stating that the twelve weeks allowed under the Family Medical Leave Act expired on January 28, 2000. Defendants inquired as to her intention to return to work. Plaintiff notified her employer by letter dated February 2, 2000 that it was her intent to return to work once she was released by her doctor.
13. After a functional capacity evaluation on March 2, 2000, Dr. Rhyne on March 10, 2000, recommended restrictions for plaintiff of no lifting more than ten pounds and alternative sitting and standing. Dr. Rhyne returned plaintiff to light duty work on March 14, 2000.
14. After Dr. Rhyne released plaintiff to light duty work, Claims Adjuster Lisa House testified that she called plaintiff's house and left a message on an answering machine that light duty work was available. Ms. House then contacted defendant-employer and confirmed that defendant-employer would accommodate the work restrictions Dr. Rhyne had given plaintiff. However, there is no evidence in the record that plaintiff ever received Ms. House's message.
15. On March 29, 2000, plaintiff consulted Dr. Chason S. Hayes with Carolina Bone and Joint complaining of pain in her back going down both legs. Plaintiff returned to Dr. Hayes on April 27, 2000, at which time Dr. Hayes ordered an MRI, which was normal. An EMG nerve conduction test showed L-5 radiculopathy but no structural abnormality. Dr. Hayes prescribed no pain medications for plaintiff's back condition. Dr. Hayes testified in his deposition that he did not think he actually excused plaintiff from work, but may have given her light duty. He instructed plaintiff to return to see him on an as needed basis when she got her blood pressure under control.
16. On May 1, 2000, Dr. Rhyne modified plaintiff's work restrictions to sedentary job requirements. Dr. Rhyne indicated that he did not feel plaintiff's sedentary work status was permanent. Dr. Rhyne did not feel plaintiff was at maximum medical improvement on May 1, 2000 and did not assign plaintiff a permanent partial disability rating. He also did not feel there was a need for a pain center referral or psychiatric treatment. Although Dr. Rhyne released plaintiff to return to work, he also recommended that she see his associate, Dr. Elmer Pinzon, for a nerve root block and for evaluation. Dr. Rhyne thought that plaintiff might better be managed by a physician who treats musculoskeletal disorders in a non-operative fashion.
17. Defendants filed a Form 24 Application to Suspend or Terminate Compensation in this matter, which was denied by the Commission on May 22, 2000.
18. Dr. Pinzon first saw plaintiff on May 23, 2000 upon referral from Dr. Rhyne. Dr. Pinzon expressed concern that plaintiff's uncontrolled hypertension might put her at risk for other complications such as stroke or possibly cardiac conditions if interventional treatments were attempted. Dr. Pinzon felt that plaintiff's pain complaints were consistent with an injury at the S1 level. He referred plaintiff to Dr. Kern Carlton at The Rehab Center for a muti-specialty program to deal with plaintiff's chronic pain. However, defendant-carrier refused to authorize this referral. After the denial of the referral, Dr. Pinzon believed that there was nothing more that he could offer plaintiff. Dr. Pinzon found that plaintiff was at maximum medical improvement because no further treatment options were available.
19. On June 30, 2000, defendants wrote plaintiff informing her they had notification that plaintiff was released to return to sedentary work, and that they would be expecting her to report for work on July 3, 2000. Plaintiff was informed that her failure to report would result in termination. Plaintiff did not report to work.
20. Although plaintiff's regular job with defendant-employer was sedentary employment, the evidence of record does not contain any specific information about the actual job offered to plaintiff or even whether it was a sedentary job. Neither defense witness, Ms. House or Ms. Getz, described the job offered to plaintiff. Ms. Getz admitted in her testimony that she could not say the kind of job tasks plaintiff had because she did not really know what plaintiff did. Ms. Getz stated that light duty work was available, involving no lifting, looking at files, closing and doing other sitting jobs, and which appears to be makework.
21. The greater weight of the evidence fails to show that the offered job was within plaintiff's restrictions and therefore suitable employment. Therefore, plaintiff did not unjustifiably refuse suitable employment.
22. When plaintiff saw Dr. Pinzon on August 18, 2000, he noted that she was unable to complete an FCE due to her hypertension. Dr. Pinzon assigned an impairment rating of five percent to plaintiff's back and released her to work with sedentary level restrictions. Dr. Pinzon based his restrictions on plaintiff's continuing complaints of back pain, as well as the fact that Dr. Rhyne had given plaintiff sedentary status previously. As recently as June 2001 Dr. Pinzon continued to believe that plaintiff could return to sedentary-type work, but that anything more strenuous than that would be dependent upon control of plaintiff's hypertension, her low back pain and pain management.
23. Plaintiff was approved for long-term disability by defendants on September 14, 2000. The record does not include any evidence concerning a possible credit to defendants for long-term disability paid to plaintiff.
24. On January 19, 2001, plaintiff saw Dr. Carol M. Kooistra, a neurosurgeon in Spartanburg, South Carolina for an independent medical evaluation. Dr. Kooistra did not have all of plaintiff's medical records but stated based upon plaintiff's complaints of pain that plaintiff would have difficulty working in a sedentary job due to her inability to sit for extended periods of time. Dr. Kooistra felt plaintiff's inability to work is related to her October 15, 1999 injury. She gave plaintiff a permanent partial disability rating of ten to fifteen percent based primarily on plaintiff's complaints of pain, using the American Medical Association guidelines combined with the North Carolina rating guidelines. Dr. Kooistra testified she used a combination of the two guidelines because the North Carolina guidelines do not have a specific criteria for pain impairment.
25. Plaintiff met with Patrick Clifford, a vocational evaluator, on May 22, 2001. Mr. Clifford found that plaintiff was intelligent and well spoken and "very skilled" in the mortgage industry. He explained that even though plaintiff's regular job at defendant-employer was already considered "sedentary" with a low physical demand, the job still required an intensive level of cognitive skills, which might be affected by the type of chronic pain and depression plaintiff represented that she was experiencing. Mr. Clifford expressed the opinion that plaintiff was permanently and totally disabled from any employment.
26. On the same day that she met with Mr. Clifford, plaintiff also met with John L. Spain, Jr., Ph.D., a licensed psychologist. Plaintiff completed the Beck Depression Inventory [BDI] and the Minnesota Multiphasic Personality Inventory, Second Edition [MMPI-2]. Dr. Spain diagnosed depression which was related to plaintiff's chronic back pain. Dr. Spain determined that plaintiff was not capable of returning to her prior job duties based on a combination of psychological and physical reasons. Dr. Spain did not discuss other issues in plaintiff's personal life that may have caused depression. Dr. Spain recommended psychological treatment to help plaintiff deal with her pain. He indicated that a number of factors may be affecting plaintiff's inability to work, and that he could not determine the cause of her problems in one visit.
27. Even though plaintiff received permanent partial disability ratings for her back, she is still in need of a pain management program and psychological treatment. Therefore, it would be premature to award any benefits for permanent partial disabilty at this time. As of the Deputy Commissioner hearing, plaintiff continued to experience numbness from the waist down; had difficulty walking, sitting and standing; and her left side hurt "all of the time." Plaintiff's level of pain affected her ability to concentrate and she avoided the company of others. At times plaintiff could not feel or was unable to press the pedals in the car while driving.
28. Plaintiff's average weekly wage as shown on the Form 60 completed on January 28, 2000 was $700.00, yielding a compensation rate of $466.69.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 15, 1999, plaintiff sustained an injury by accident to her back arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendants admitted compensability of plaintiff's injury by accident on January 28, 2000 by filing a Form 60. N.C. Gen. Stat. § 97-18.
3. The Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff.Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277
(2001).
4. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v.Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
5. In the instant case, plaintiff met her initial burden to show that she is disabled. Plaintiff was unable due to her compensable injury and resulting chronic pain and depression to return to her regular job or any other employment. Because of the vague nature of work offered by defendant-employer, the greater weight of the evidence fails to show that the job was suitable and therefore the Commission finds that plaintiff's refusal to accept this employment was justified. N.C. Gen. Stat. §97-32.
6. Therefore, plaintiff is disabled and is entitled to be paid by defendants ongoing total disability compensation at the rate of $466.69 per week beginning December 13, 1999 and continuing until such time as plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to medical treatment resulting from her admittedly compensable injury by accident, including treatment for depression and pain management. N.C. Gen. Stat. § 97-25.
8. Neither party is entitled to recover attorney's fees under N.C. Gen. Stat. § 97-88.1 in that this claim was brought and defended upon reasonable grounds.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. As the result of the compensable injury by accident, plaintiff was disabled and entitled to receive total disability compensation at the rate of $466.69 per week for the period beginning December 13, 1999 and continuing thereafter. Defendants are currently paying compensation to plaintiff and shall continue payment of said compensation until further Order of the Commission.
2. A resonable attorney's fee in the amount of twenty-five percent (25%) is hereby approved for plaintiff's counsel and shall be paid by forwarding to counsel every fourth compensation check due plaintiff.
3. Defendants shall pay for medical expenses incurred or to be incurred as a result of the compensable injury by accident, including pain management and treatment of plaintiff's depresssion.
4. Defendants shall pay the costs, except the costs for the depositions of Patrick Clifford, and John L. Spain, which plaintiff agreed to pay in an earlier agreement.
5. Plaintiff argued to the Commission that she was entitled to compensation at the maximum compensation rate for 1999 of $560.00. However, the Industrial Commission is unable to determine plaintiff's average weekly wage from the pay stubs in Plaintiff's Exhibit 3 due to the poor quality of the exhibit. Ms. Lisa House of defendant-carrier testified at the deputy Commissioner hearing that in February 2000 the average weekly wage was recalculated at plaintiff's request using pay stubbs. The record is unclear whether this recalculation is shown on the Form 60. Defense counsel at oral arguments before the Full Commission appeared to concede that the average weekly wage was incorrect. Because of a lack of competent evidence in the record, the Commission finds that plaintiff's average weekly wage as shown on the Form 60 is correct. However, this finding does not preclude the parties from subsequently submitting more accurate wage information to the Commission for recalculation of an average weekly wage or from reaching an agreement as to the correct average weekly wage.
This the ___ day of March 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN