* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments before the Full Commission. The appealing parties have shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. Specialty Risk Services is the carrier on the risk.
4. Plaintiff's compensation rate is $674.00, the maximum compensation rate for the year 2003.
5. Plaintiff sustained a compensable injury by accident on October 29, 2003.
6. The issues before the Full Commission are whether plaintiff unjustifiably refused suitable employment on December 17, 2003; whether plaintiff is entitled to any ongoing disability benefits; and whether Dr. Khoury is an appropriate physician to conduct plaintiff's follow-up medical care.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on January 6, 1976. Plaintiff received his GED and spent one year enrolled at a community college in Chesapeake, Virginia. Plaintiff has worked as a nightclub promoter, laborer, and factory worker.
2. On November 21, 2001, plaintiff was placed as a temporary worker at defendant-employer through Coastal Staffing. Plaintiff became a permanent employee of defendant-employer on July 1, 2002. Plaintiff was initially hired as a floor person, but within a week he was promoted to "inspector tagger." As an "inspector tagger," plaintiff was required to inspect *Page 3 
steel plates that were up to 120 inches wide and 40 to 50 feet long. An inspection was made for cracks or any other defects in the steel. Plaintiff utilized a dye stamp gun to stamp the plates with the size of the plate and where the plate was going. Plaintiff was required to lift up to 50 pounds and sometimes more, and also to do maintenance work. Plaintiff worked four 12-hour days, was off work for four days, and then worked four 12-hour night shifts.
4. On October 29, 2003, plaintiff suffered a compensable injury when he was struck on the chin by a crane hook while replacing shafts in a cooling bed at defendant-employer's Hertford County steel plant.
5. Plaintiff received medical treatment for his injury at Roanoke-Chowan Hospital and was later transferred to Pitt County Memorial Hospital. He was diagnosed with a laceration to his chin and spinal cord syndrome. Plaintiff was released from the hospital on October 31, 2003, with instructions to follow up at the Trauma Center at Pitt Memorial Hospital. Plaintiff was not released to return to work.
6. Defendant-employer investigated the circumstances surrounding plaintiff's injury and statements were taken from plaintiff and his co-workers. Plaintiff's co-workers indicated that plaintiff had been guiding the crane hook and rigging to prevent it from becoming caught after replacing a shaft. They stated that when the hook became caught it caused the rigging to become taut. When the hook released, the hook struck plaintiff on the chin. Plaintiff's account differed in that he stated that he was not guiding the hook and had walked away from the rigging at the time of the accident.
7. Defendant-employer's investigation ultimately found that the incident occurred as related by two of plaintiff's team members, and not as reported by plaintiff. The investigation also determined that the cause of the accident was personal responsibility on the part of plaintiff. *Page 4 
Plaintiff disagreed with these findings and refused to sign off on the investigation report or the employee responsibility form.
8. Plaintiff returned to the trauma clinic at Pitt Memorial Hospital on November 5, 2003, reporting pain all over his body, worse on his right side. Plaintiff was released to light duty work with restrictions of no pushing or pulling, no twisting, no stair climbing, no operating trucks, dollies or small vehicles, no driving and no work in high or low temperatures. Plaintiff returned to work around November 5, 2003.
9. On November 13, 2003, plaintiff was examined by Dr. Semaan Khoury. Dr. Khoury removed the sutures from plaintiff's chin and also removed some of the work restrictions imposed on plaintiff by the physicians at the trauma clinic.
10. Plaintiff returned to the trauma clinic on December 3, 2003 with complaints of pain and tingling continuing from his neck into his right shoulder. A cervical MRI was recommended and plaintiff was continued on light duty restrictions.
11. While plaintiff continued treatment and worked in a light duty capacity, further meetings were held with regard to the investigation of the accident. Plaintiff was suspended by his supervisor, Randy Stagen, on December 15, 2003, because he would not sign the responsibility form.
12. On December 17, 2003, MRI results revealed minimal spondylosis at the C4-5 region with a slight disc bulge at C5-6. As plaintiff was experiencing pain in his right arm, the decision was made to refer him back to Dr. Franklin Jones, a neurosurgeon, for evaluation. Plaintiff's restrictions were changed to no lifting over ten pounds until Dr. Jones could evaluate him. *Page 5 
13. Also on December 17, 2003, plaintiff met with Giff Daughtridge, General Manager, Johnny Jacobs, Controller, and Mr. Skagen to resolve the matter of the safety investigation. Plaintiff was told that he would not have to sign off on the investigation report, but that he would have to accept some amount of personal responsibility. Plaintiff testified that he could not sign a form that was not true and again offered to write his own account and sign that. This request was denied and plaintiff was informed by Mr. Skagen that if he did not sign the form he would be terminated. Plaintiff did not sign the form and he was escorted to his vehicle. Later, plaintiff emailed Mr. Daughtridge, Mr. Gamboni and Mr. Skagen, stating that he did not resign and that he wanted to continue working for defendant-employer; however, plaintiff did not receive a reply to his email. The Commission finds that plaintiff was terminated from his employment on December 17, 2003.
14. Mr. Daughtridge testified that there is no scenario in which an employee who refused to either accept responsibility or cooperate with the safety investigation would be allowed to return to work and that this would apply equally to all investigations and employees, without regard to whether personal injury was involved. However, Mr. Jacobs' testified that there was only one other incident at defendant-employer where an employee was considered to have resigned after refusing to take part in a safety investigation and accept personal responsibility.
15. After he was terminated by defendant-employer, plaintiff earned $50.00 a day transporting church members on Sundays. Plaintiff performed this job from the time he was terminated from defendant-employer through the middle of March 2004. Plaintiff also attempted to work as a painter but was unable to perform the job duties within the allotted time. Additionally, plaintiff testified he is pursuing his real estate license. *Page 6 
16. Plaintiff applied for and received unemployment benefits after he was terminated from defendant-employer. Plaintiff participated in a job search in order to be eligible to receive unemployment benefits and he filled out two to three applications per week over a four-month period.
17. On January 15, 2004, Dr. Jones examined plaintiff, who presented with complaints of fatigue, change in appetite, headaches, fainting, dizziness, blurred vision, ringing in the ears, sinus trouble, difficulty swallowing, shortness of breath, chest pain, swelling of the feet, and joint pain. Dr. Jones' impression was possible cervical radiculopathy. Dr. Jones further stated that plaintiff suffered a central cord syndrome and believed that he would improve over time. Dr. Jones took plaintiff out of work from February 19, 2004 until his appointment with the pain clinic.
18. Also on February 19, 2004, defendants commenced payment of temporary total disability benefits pursuant to a Form 60.
19. Plaintiff began treatment at the pain clinic at Pitt Memorial Hospital. A course of prescription medication was initiated, but plaintiff continued to experience pain and developed other medical issues from the side effects of the opiate medications. After several weeks, plaintiff was placed on a regimen of Elavil, Keppra and Neurontin and was released from the pain clinic with the understanding that his primary care doctor would continue to prescribe medication for him. During his course of treatment with the pain clinic, plaintiff was referred to Dr. Richard Osenbach at Duke University for an evaluation.
20. On January 6, 2005, plaintiff returned to Dr. Jones. Dr. Jones noted that plaintiff had chronic neck and arm pain with possible radiculitis, along with low back discomfort. Dr. *Page 7 
Jones further stated that plaintiff was at maximum medical improvement and gave him a 15% permanent partial disability rating to the back.
21. On February 8, 2005, plaintiff saw Dr. Osenbach. Dr. Osenbach diagnosed plaintiff with myofascial pain syndrome with chronic neck pain, possible cervical facet syndrome and cervical radiculitis. Dr. Osenbach recommended that plaintiff continue treatment with the pain clinic at Pitt Memorial Hospital.
22. On February 10, 2005, plaintiff saw Dr. James Fulgham with Carolina Back Institute for a second opinion. Dr. Fulgham agreed with the 15% permanent partial disability rating assigned by Dr. Jones.
23. Plaintiff continued to experience medical problems from his compensable injury. Once Dr. Jones released him from care, plaintiff did not have a physician to prescribe his pain medications. Plaintiff, through counsel, made several written requests for authorization for medical treatment with both Dr. Jones and his family doctor; however, defendants did not respond.
24. A subsequent functional capacity examination (FCE) demonstrated that plaintiff was capable of working at the medium duty level. Plaintiff testified that he experienced difficulty in performing the tasks required by the FCE and believed that he pushed himself too hard during the FCE, as his pain level increased after the examination.
25. On November 17, 2005, Dr. Jones reviewed plaintiff's FCE results and stated that plaintiff was capable of working at the intermediate level of work for an eight-hour day. This involves exerting 20-50 pounds of force occasionally and/or 10-25 pounds of force frequently and/or greater than negligible up to 10 pounds of force constantly to move objects. Dr. Jones testified that he would expect someone with plaintiff's restrictions to be able to work and that he *Page 8 
would encourage plaintiff to be as active as possible. The Commission finds that the medical evidence demonstrates that plaintiff does not suffer from any neurological deficit that would restrict his activities. The Commission further finds that plaintiff did not reach maximum medical improvement until after his FCE on November 17, 2005.
26. On May 31, 2006, Dr. Timothy Frei, an internal medicine specialist, diagnosed plaintiff with chronic neck and right upper extremity pain and prescribed pain medication. Dr. Frei did not discuss work restrictions with plaintiff. Plaintiff requested defendant-carrier to authorize Dr. Frei as his treating physician to manage his medications. Defendant-carrier denied this request and stated that Dr. Khoury would be plaintiff's authorized treating physician.
27. Plaintiff returned to Dr. Khoury on June 6, 2006. Dr. Khoury noted that plaintiff appeared to be in pain and was walking with a limp. Dr. Khoury's examination showed minor right upper extremity pain but no muscle atrophy or joint swelling. Dr. Khoury opined that these symptoms were unexpected and he could not explain them. A June 21, 2006 MRI was normal. Dr. Khoury stated that he did not address work restrictions with plaintiff, since plaintiff was not working. A follow up appointment was scheduled for plaintiff, but plaintiff did not return.
28. Plaintiff was contacted by David Stewart, a vocational rehabilitation specialist, hired by defendant-carrier. Plaintiff met with Mr. Stewart in April 2006 and a Vocational Rehabilitation Plan was prepared. Mr. Stewart noted in his report of December 2, 2006 that copies of the Vocational Rehabilitation Plan were provided to all parties on May 20, 2006 and, at the request of the carrier, plaintiff's file was placed on hold. Plaintiff had no further contact with Mr. Stewart after their initial meeting.
29. Defendant-employer made no attempt to offer work to plaintiff within his restrictions after his release to return to medium duty work. *Page 9 
30. Plaintiff entered into a settlement agreement with defendants and a compromise settlement agreement was prepared and forwarded to plaintiff. At the time of the settlement agreement, plaintiff was not represented by legal counsel. Plaintiff signed the compromise settlement agreement and also the separation agreement and general release that accompanied the compromise settlement agreement, as he was told that the only way he would receive a settlement was to sign both additional documents. Plaintiff received $2,000.00 for signing the documents as an advance on his settlement. The Industrial Commission, however, on September 8, 2006, denied the compromise settlement agreement. Plaintiff understood that when the Industrial Commission did not approve the compromise settlement agreement, they also were not approving the separation agreement and general release. After the compromise settlement agreement was not approved, defendants continued to pay temporary total disability to plaintiff.
31. After plaintiff reached maximum medical improvement and was given work restrictions pursuant to his FCE on November 17, 2005, plaintiff was capable of some work but did not make reasonable efforts to find work. Plaintiff has not shown that it would be futile for him to look for work.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 29, 2003, plaintiff suffered an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). *Page 10 
2. On December 17, 2003, defendant-employer terminated plaintiff for his refusal to accept some responsibility for the October 29, 2003 accident however, the evidence does not establish that plaintiff's position was unreasonable. Although the evidence does not show that plaintiff was fired because of his compensable injury or disability, defendants have not shown that plaintiff constructively refused suitable employment. Accordingly, plaintiff's termination did not constitute a constructive refusal of suitable employment. N.C. Gen. Stat. § 97-32;Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 587
(1996).
3. Defendants admitted the compensability of plaintiff's injury by accident on October 29, 2003 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277 (2001).
4. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485
(2001); Russell v. Lowes Product Distribution, *Page 11 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms, Inc., supra.
5. In the present case, plaintiff reached maximum medical improvement on November 17, 2005 and was released to medium duty work. However, plaintiff did not meet his burden to prove that after November 17, 2005, he was unable to obtain employment after a reasonable effort or that it was futile for him to seek employment because of other factors. He was capable of some work and no doctor took him out of work. N.C. Gen. Stat. § 97-29; Russell v. Lowes Product Distribution, supra.
6. Upon reaching maximum medical improvement, a claimant is not entitled to recover both ongoing temporary total disability benefits and a permanent partial impairment rating; he must elect the more munificent remedy. Gupton v. Builders Transport, 320 N.C. 38, 357 S.E.2d 674
(1987); Whitley v. Columbia Lumber, 318 N.C. 89, 348 S.E.2d 336 (1986);Franklin v. Broyhill Furn. Indust., 123 N.C. App. 200, 472 S.E.2d 382
(1996).
7. In this case, as the temporary total disability compensation plaintiff received since November 17, 2005, exceed the benefits to which he would be entitled under N.C. Gen. Stat. § 97-31 for his 15% permanent partial impairment to his cervical spine, plaintiff is entitled to no additional disability compensation. Gupton v. Builders Transport, supra;Whitley v. Columbia Lumber, supra; Collins v. Speedway MotorSports, 165 N.C. App. 113, 598 S.E.2d 185 (2004); Franklin v. BroyhillFurn. Indust., supra.
8. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may *Page 12 
reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
9. Pursuant to plaintiff's request, Dr. Frei is designated as plaintiff's authorized treating physician. N.C. Gen. Stat. § 97-25. Defendants shall authorize and provide treatment that is provided or recommended by Dr. Frei that is related to plaintiff's compensable injury.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for additional compensation is DENIED.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Plaintiff's request that Dr. Frei serve as his authorized treating physician is GRANTED.
3. Defendants shall pay the costs.
This 19th day of December, 2007.
 S/______________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________________ BUCK LATTIMORE COMMISSIONER