***********
Based upon review of all of the competent evidence of record with reference to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS, with some modifications, the Opinion and Award of the Deputy Commissioner.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 STIPULATIONS
1. On May 5, 2000, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between plaintiff Alicia Perez and defendant-employer Culp, Inc.
3. Hartford Underwriters Insurance Company was the carrier on the risk for defendant-employer.
4. Plaintiff's average weekly wage shall be determined by the Commission in accordance with a Form 22 prepared by the employer.
5. The carrier has paid compensation to the employee for the periods May 9, 2000 to May 22, 2000, May 25, 2000 to June 4, 2000, June 7, 2000 and June 26, 2000 to July 2, 2000.
6. The parties stipulated into evidence the following at the hearing before Deputy Commissioner Chapman:
a. Stipulated Exhibit 1 — Form 22 dated May 5, 2000.
 b. Stipulated Exhibit 2 — Plaintiff's answers to defendants' interrogatories.
 c. Stipulated Exhibit 3 — Packet of documents from plaintiff's personnel file.
 d. Stipulated Exhibit 4 — Supervisor's investigation report.
 e. Stipulated Exhibit 5 — Packet of medical records and reports, which were submitted after the hearing before the Deputy Commissioner.
7. The issues before the Commission are whether plaintiff is entitled to additional benefits or compensation related to her May 5, 2000 injury by accident; was plaintiff at maximum medical improvement on January 2, 2001; did plaintiff sustain permanent partial impairment; did plaintiff sustain a change of condition in April, 2002; whether plaintiff's back symptoms are related to her injury by accident; did plaintiff refuse to accept suitable employment pursuant to N.C. Gen. Stat. § 97-32; and are defendants entitled to a credit for overpayment of compensation due to the use of an incorrect average weekly wage.
 ***********
Based upon all the competent evidence, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty years old at the time of the hearing before the Deputy Commissioner and completed the sixth grade in Mexico. Plaintiff began working for defendants in June 1998 as a tasland operator.
2. Plaintiff's job involved operating twenty-five machines which made yarn, and her duties included changing thread, putting empty cones onto the machine, doffing the cones once they were full of yarn, tying broken ends, fixing breakdowns and making sure that the yarn produced was of suitable quality.
3. On May 5, 2000, plaintiff sustained a compensable injury by accident when a gear weighing five to ten pounds fell three to four feet and struck the top of her right knee as she was squatting beside one of her machines. Defendants admitted compensability for the injury by a Form 60 signed June 15, 2000. Since the injury occurred close to the end of her shift on a Friday, plaintiff reported the injury and took some over-the-counter pain medication but did not ask to see a doctor. The following Monday, she called the plant and requested medical treatment.
4. Plaintiff was then sent to Monroe Urgent Care where Dr. H. D. Belk examined her. He noted swelling and bruising of her knee and diagnosed her with a severe contusion of her right thigh, knee and tibia. Although Dr. Belk initially restricted plaintiff to sedentary work, she returned to the clinic the next day complaining of increased symptoms and was taken completely out of work at that time.
5. Despite treatment with rest, medication and later physical therapy, plaintiff continued to report persistent symptoms. Since she had prominent varicose veins, Dr. Belk was concerned that plaintiff might have a clot, so she was referred for a Doppler study to rule out deep vein thrombosis, which was normal. In view of plaintiff's continuing complaints, Dr. Belk referred plaintiff to Dr. David R. Kingery, an orthopedic surgeon.
6. Dr. Kingery examined plaintiff on June 5, 2000. Plaintiff described anterolateral knee pain, popping in her kneecap and significant swelling. On examination there was no evidence of effusion, but plaintiff was very tender at the lateral patellofemoral joint and over the quadriceps tendon at the kneecap. Dr. Kingery also noted that there was a lateral tilt to plaintiff's kneecap, which was probably preexisting, and that he could push her kneecap out of its track. Dr. Kingery diagnosed plaintiff with a patella contusion and patellofemoral malalignment with patella subluxation. He prescribed a knee sleeve to hold plaintiff's kneecap in proper position, prescribed Celebrex, an anti-flammatory medication, and restricted her to light-duty work.
7. Defendants provided plaintiff with light-duty work during most of the time that she was under work restrictions. Plaintiff's supervisor noticed that, despite her symptoms, she was not limping and she did not always wear her knee brace. Plaintiff told him that the brace irritated her skin.
8. When plaintiff returned to Dr. Kingery on June 29 and July 25, 2000, she reported continuing symptoms. Dr. Kingery ultimately increased her medication and adjusted her restrictions.
9. On August 22, 2000, plaintiff reported improvement and had been able to return to working most of her machines. However, plaintiff's medicine had run out and her symptoms had increased without the medication.
10. Consequently, Dr. Kingery prescribed additional Celebrex for plaintiff. He also released her to full duty work.
11. Plaintiff returned on October 3, 2000 and saw Dr. Kingery's physician's assistant. At that time plaintiff was working her regular job but she reported increased pain and swelling by the end of her work shift. On examination there was some fullness at the outside of her knee. The physician's assistant decided to continue plaintiff's medication and to order an MRI of her knee.
12. Plaintiff next saw Dr. Kingery on October 30, 2000. He reviewed her MRI, which showed a cyst on the anterior cruciate ligament and some degenerative signal in the lateral meniscus. However, there was no other evidence of injury to plaintiff's tendons, ligaments or bony structures on the film. Dr. Kingery considered the possibility that the cyst might be having a bearing on plaintiff's symptoms, but the cyst was not likely related to her injury and was probably just an incidental finding.
13. The symptoms plaintiff complained of October 30, 2000 were radicular in nature, with buttock and leg pain and a positive straight leg raising test. Consequently, Dr. Kingery diagnosed plaintiff with sciatica and recommended treatment for her back, at the point where the sciatic nerve was being irritated.
14. Plaintiff was resistant to Dr. Kingery's recommendations because she did not believe that she had a back problem. Plaintiff then went to a chiropractor, Dr. Scott Hartsell, who did not think that she had sciatica and who diagnosed her with a knee problem.
15. Defendants refused to authorize the treatment Dr. Kingery recommended for plaintiff's radicular symptoms since there had been no such reported problems for over five months following the injury.
16. When plaintiff returned to the Dr. Kingery on November 28, 2000, plaintiff had made up her mind that she was not experiencing back problems, and Dr. Kingery thought that there had probably been miscommunication between him and plaintiff due to the language barrier, even though the niece who came with plaintiff to the doctor's appointments was a good translator. After examining plaintiff that day, Dr. Kingery was still convinced that she had sciatica. Since treatment with a physiatrist was not authorized, Dr. Kingery gave plaintiff exercises to do and continued her prescription of Celebrex.
17. Dr. Kingery next saw plaintiff on January 2, 2001. Her symptoms were improved at that time with only minimal lateral knee pain. Dr. Kingery prescribed more Celebrex for plaintiff but released her at maximum medical improvement with a 0% impairment rating.
18. Up until that time, plaintiff had worked at the Monroe plant of defendant-employer, but that plant closed in February or March 2001. She was then offered a position at the plant in Pageland, South Carolina, which she accepted. Plaintiff's new supervisor, Bertha Clack, knew nothing about her injury at work from the previous year.
19. Plaintiff did not complain of knee problems, did not limp and did not make any reference to the injury. Aside from attendance problems, which had been an issue with plaintiff for years, the only problem Ms. Clack noticed that plaintiff had performing her job was misreading piece tickets on occasion.
20. Plaintiff returned to Dr. Kingery on April 3, 2001 complaining of on-going knee pain which was radiating down to her foot. In view of her positive straight leg raising test, he diagnosed her right-sided leg pain as sciatica and again recommended that she see a physiatrist. 21. Plaintiff did not want to use her health insurance coverage for the evaluation by a physiatrist and defendants would not pay for it, so she did not receive follow-up care. Plaintiff returned to Dr. Kingery again on August 20, 2001 when she reported on-going right leg pain, which was worse after working seven straight days. There were no specific abnormalities found on examination of her knee, but there were again findings consistent with sciatica.
22. Dr. Kingery gave plaintiff work restrictions of no constant standing and a prescription for Vioxx. Since he assumed that she had developed sciatic problems shortly after the injury and that these problems had been missed due to the language barrier, Dr. Kingery wrote to defendants asking that physical therapy be approved for plaintiff. However, defendants would not authorize treatment for sciatica.
23. Plaintiff missed a week of work in September 2001 and reported it was due to an increase in leg pain. At the request of Ms. Clack, plaintiff tried to get a work excuse from Dr. Kingery, but he would not give her one.
24. Ms. Clack advised plaintiff she would have to come into the plant and talk to Greg Clayton, the department manager, because she had missed more days than allowed under the attendance policy without a doctor's excuse. Other than the week in September 2001 when she was out of work, plaintiff's absences were for headache, sore throat, tooth ache, or not feeling well in general.
25. Plaintiff went to the plant and, for the first time, told the employer about her knee injury. She also told the employer that Dr. Kingery would not give her a note to be out of work. Mr. Clayton advised her that there would be some sort of disciplinary action taken but was not specific about what the action would be. Plaintiff was expected to report for work for her shift that night. Plaintiff did not report for work that night, however, and did not call the plant to indicate that she would not be coming. Since this was the third time since June 2001 that plaintiff had failed to call in or show up for work, on October 2, 2001 she was terminated for violating defendant's attendance policy. Defendant's attendance policy provided that an employee with three unexcused absences in the same calendar year would be terminated. An unexcused absence occurs when an employee fails to appear for work and does not call in thirty minute ahead of her shift to advise the supervisor that she will be absent.
26. The Full Commission finds defendant-employer provided plaintiff with suitable work within her restrictions and terminated her for misconduct for which any other employee would have been terminated.
27. Except for a brief period of work at a friend's grocery store, plaintiff did not look for work or return to work following her termination by defendant-employer. However, plaintiff did babysit her grandchild several days per week.
28. Plaintiff did not return to Dr. Kingery for further treatment, but on April 30, 2002 she went to Dr. Sandra Abda, another orthopedic surgeon, for a second opinion regarding her knee.
29. On examination Dr. Abda found no evidence of atrophy, no effusion, good range of motion, and a click under the patella when plaintiff straightened her leg. Plaintiff also had calluses on both knees, but claimed that she was unable to get on her hands and knees to clean floors. Dr. Abda felt that the calluses were inconsistent with plaintiff's subjective complaints of pain. Although plaintiff admitted at the Deputy Commissioner hearing that she cleaned houses in previous years, she denied cleaning houses after her termination from employment.
30. Dr. Abda was of the impression that plaintiff had patellofemoral syndrome arising from degeneration of the cartilage behind the kneecap. Dr. Abda felt that plaintiff's condition was likely due to the compensable injury because the condition was the type of problem which developed after a couple of years following a blow to the kneecap. Plaintiff's history was typical for the condition. Dr. Abda stated that plaintiff's impairment was mild and recommended injecting the knee and then consideration of an arthroscopy to inspect the articular surface. Defendants did not provide the treatment recommended.
31. At her deposition Dr. Abda stated that if she had to rate plaintiff as of April 30, 2002, she would assign a 10% permanent impairment rating to plaintiff's leg. Plaintiff's work restrictions were no prolonged bending, stooping or squatting.
32. Dr. Abda did not believe that plaintiff's back problems were related to her compensable injury.
33. Although Dr. Kingery was concerned that plaintiff's sciatic pain dated back to her injury and that the symptoms had not been communicated to him by the translator, it appears clear from the medical records and the testimony in the case that plaintiff did not describe such symptoms until October 30, 2000. Even when plaintiff reported her back symptoms, she was not willing to believe that the pain in her leg was coming from nerve impingement in her back. The communication problem that Dr. Kingery sensed was due to the fact that plaintiff had her own ideas about what was wrong and would not listen to him when what he told her was different from her own opinions.
34. The Full Commission finds based upon the greater weight of the medical evidence that in October 2000 plaintiff did not develop sciatica related to her injury at work five months earlier. The work restrictions plaintiff received on October 30, 2000 and on August 20, 2001 were due to her sciatica and were not due to her knee injury. After November 17, 2000 plaintiff was capable of performing her regular work duties with respect to her knee injury and she remained capable of earning her regular wages until she was terminated for cause on October 2, 2001.
35. By April 30, 2002, plaintiff's knee symptoms had worsened to the point that there were more physical findings on medical examination. However, in view of the fact that plaintiff had noticeable calluses on both knees at that time, it appeared that her complaints to Dr. Abda were somewhat exaggerated. Dr. Abda, assuming the accuracy of plaintiff's complaints, gave her restrictions of no prolonged bending, stooping and squatting where the knee was bent. Dr. Abda said that she would not have recommended that plaintiff perform the creeler job as of April 30, 2002 if the job involved prolonged bending, stooping and squatting.
36. In view of plaintiff's exaggeration of her symptoms, the fact that the greater weight of the evidence does not show that plaintiff's job with defendants involved prolonged bending, stooping or squatting, and because no doctor, including Dr. Abda, stated that plaintiff was incapable of performing some work, plaintiff failed to prove that she was unable to earn her former wages after her termination from employment or as of the April 30, 2002 examination by Dr. Abda.
37. Based upon the greater weight of the evidence, the Full Commission finds that plaintiff did not experience a change of condition in April 2002.
38. The Full Commission finds, in view of the additional findings of Dr. Abda, that plaintiff had not reached maximum medical improvement as of the date of the hearing before the Deputy Commissioner. Dr. Kingery agreed that the injections that Dr. Abda recommended could have both diagnostic and therapeutic value, considering the change in plaintiff's symptoms. Consequently, the injections would tend to effect a cure and give plaintiff relief from the knee condition she suffered as a result of her May 5, 2000 injury by accident.
39. Since plaintiff has not reached maximum medical improvement, no findings are made at this time regarding the extent of any permanent partial disability she may have sustained as a result of her injury.
40. Defendants admitted liability for the knee injury in question pursuant to a Form 60 filed with the Industrial Commission and they paid compensation to plaintiff for temporary total disability from May 9-22, 2001, from May 25-June 4, 2001, on June 7, 2001 and from June 26-July 2, 2001. Defendants paid compensation based upon an average weekly wage of $390.40, which yields a compensation rate of $260.20. The Form 60 stated that the compensation amounts were subject to change based on a Form 22.
41. The compensation paid to plaintiff through July 2, 2001 was at a higher weekly rate than is found to be due. Based upon the Form 22 submitted by defendants, plaintiff's average weekly wage was $360.55, which yields a compensation rate of $240.37. However, plaintiff was unable to work on May 6 and 7, 2001 and was only provided light-duty work for half days on May 23 and 24, 2001, yet was not paid compensation for those periods. In addition, she was unable to work in any capacity as a result of her knee injury from November 9 through 17, 2000.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 5, 2000, plaintiff sustained an admittedly compensable injury by accident to her right knee arising out of and in the course of her employment with defendants. N.C. Gen. Stat. § 97-2(6).
2. As the result of the compensable injury, plaintiff is entitled to additional compensation for temporary total disability at the rate of $240.37 per week for one and 4/7ths weeks for the periods of May 6 and 7, 2000 and November 9 through 17, 2000, subject to a credit for compensation overpaid by defendants at a higher compensation rate. N.C. Gen. Stat. §§ 97-29; 97-42.
3. Plaintiff is entitled to compensation for temporary partial disability for the two days in May 2000 when she was only able to work part time. N.C. Gen. Stat. § 97-30.
4. Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination constitutes a constructive refusal to perform the work provided, unless she is able to show that her inability to find or hold other employment of any kind is due to the work-related injuries. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996).
5. In the case at bar the greater weight of the evidence shows that after her termination plaintiff was capable of some work within restrictions and that it would not be futile for her to look for work due to preexisting conditions, that plaintiff did not make reasonable efforts to find other employment, and that no doctor, including Dr. Abda, took her out of work. Demery v.Perdue Farms, Inc., 142 N.C. App. 259, 545 S.E.2d 485 (2001). Therefore, after October 2, 2001 plaintiff failed to prove that she was disabled from employment due to the compensable injury and is not entitled to additional compensation. N.C. Gen. Stat. §97-29; Seagraves v. Austin Co. of Greensboro, supra.
6. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including the injections recommended by Dr. Abda. Dr. Abda is approved as plaintiff's treating physician. N.C. Gen. Stat. §§ 97-2(19);97-25.
7. Plaintiff's sciatica diagnosed in October 2000 was not a proximate result of the injury by accident giving rise to this claim. Consequently, she is not entitled to compensation for any time missed from work or to medical compensation arising from that condition. N.C. Gen. Stat. § 97-2 et. seq.; Click v. FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $240.37 per week for one and 4/7ths weeks, for her additional temporary total disability, but subject to a credit in favor of defendants for their overpayment of compensation for periods previously paid. This compensation has accrued and shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay compensation to plaintiff for temporary partial disability for the two days in May 2000 when she only worked partial days, subject to the attorney's fee approved below.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of this injury by accident, including those arising from the injections recommended by Dr. Abda, who is approved as plaintiff's treating physician.
Plaintiff's claim for workers' compensation benefits for her symptoms of sciatica is denied.
5. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the compensation awarded and paid directly to plaintiff's counsel.
6. Defendants shall pay the costs.
This the 21st day of April 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/mlb