* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Gillen.
 * * * * * * * * * * * RULING ON EVIDENTIARY ISSUES
Defendants argue that because the Opinion and Award was written by a Deputy Commissioner who did not observe the live testimony, defendants were denied procedural due process under N.C. Gen. Stat. § 97-84. The Full Commission agrees that, pursuant to the statutory provisions, the case should not have been reassigned to be written by another Deputy Commissioner without the consent of the parties. However, the Full Commission is the sole judge of credibility, the ultimate finder of fact, and has the authority to determine the case from the written hearing transcript. Adamsv. AVX Corp., 349 N.C. 676, 509 S.E.2d 411 (1998); Joyner v.Rocky Mount Mills, 92 N.C. App. 478, 374 S.E.2d 610 (1988). Thus, it is unnecessary to remand the case to another Deputy Commissioner for a de novo hearing and defendants' objection to the reassignment of the case is overruled.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On February 18, 2002, the parties hereto were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On February 18, 2002, defendant-employer employed three or more employees.
3. Liberty Mutual Insurance was the carrier on the risk.
4. The following items were entered into evidence at the Deputy Commissioner's hearing:
a. Stipulated Exhibit 1 — the Pre-Trial agreement.
 b. Stipulated Exhibit 2 — a packet of medical records.
 c. Stipulated Exhibit 3 — Defendants' Responses to Plaintiff's First Set of Interrogatories.
d. Stipulated Exhibit 4 — additional medical records.
 e. Plaintiff's Exhibits 1-7 — seven photographs of plaintiff's truck.
 f. Plaintiff's Exhibit 8 and 9 — plaintiff's tax records for 2001 and 2002, respectively.
 g. Defendants' Exhibit 1 — letter of cancellation of contract.
 h. Defendants' Exhibit 2 — Department of Transportation log.
 i. Defendants' Exhibit 3 and 4 — insurance application and papers, respectively.
5. The issues before the Commission are:
 a. Whether plaintiff was an employee or an independent contractor at the time of his accident on February 18, 2002;
 b. Whether plaintiff sustained an injury by accident on February 18, 2002;
 c. Is plaintiff's claim barred by N.C. Gen. Stat. § 97-22;
 d. Whether plaintiff is otherwise estopped from asserting his claim;
e. What is plaintiff's average weekly wage; and
 f. To what amount of indemnity and medical compensation is plaintiff entitled.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of Deputy Commissioner Stephenson's hearing, plaintiff was 41 years old. Plaintiff has a tenth grade education but does not read well. Plaintiff's employment history consists nearly exclusively of work in the moving business, which involved driving a truck and physically packing, loading, unloading, and unpacking goods and furniture. Plaintiff owned his own truck.
2. For the ten years prior to his work-related injury, plaintiff drove a truck and moved furniture. He worked for three different companies, but worked for defendant Graebel Van Lines (hereinafter "Graebel") during most of the ten-year period.
3. Graebel is an interstate trucking company that is in the business of moving furniture and other property. Graebel has two employees involved in the business of moving customers, and at least 36 workers who are over-the-road truck drivers. In December 1999 when plaintiff returned to work for Graebel, Graebel presented plaintiff with a standard "Independent Contractor Agreement for Transportation Services," or "trip lease agreement," for his signature. Plaintiff intended to take this document home so that someone could help him read it, but Tom Martin, vice-president of operations for Graebel, told plaintiff that he had to sign the agreement immediately or plaintiff could not work for Graebel.
4. In May 2000, Graebel presented plaintiff with another "trip lease agreement." This document was sent to plaintiff by certified mail and plaintiff had to sign and return it within 48 hours of receipt in order to keep working for Graebel. The contract provided that plaintiff was an independent contractor and that he was required to furnish the truck and labor for the moving jobs. However, also included in the contract is the provision that Graebel "shall have exclusive possession, control, and use" of plaintiff's truck and that Graebel assumed complete responsibility for the operation of the truck while plaintiff performed his job duties.
5. As part of plaintiff's work with Graebel, plaintiff purchased an occupational hazard insurance policy through the National Association of Independent Truckers. However, plaintiff knew little about the organization, and simply signed the insurance forms when he applied to work for Graebel in May 2000 so that he would get insurance. Plaintiff certified to NAIT that he was an independent contractor and not an employee of any motor carrier in order to get insurance coverage. The NAIT policy paid some benefits to plaintiff after his injury on February 18, 2002.
6. Before the work-related accident, plaintiff had experienced minor back pain from moving furniture but had not seen a doctor for his back condition for two to three years. The doctors he saw during his prior episodes of back pain prescribed physical therapy and heating pads and did not recommend surgery.
7. On February 18, 2002, plaintiff sustained a back injury when he picked up a triple dresser with the help of an assistant. Plaintiff turned and felt a pop in his spine and suffered immediate back pain. Plaintiff called Graebel and asked for another worker to be sent to the worksite because of the injury. No supplemental worker was sent and plaintiff finished moving the load, with his assistant doing most of the work. After work, plaintiff telephoned Mr. Martin and told him that he had hurt his back moving furniture and needed to go to a doctor.
8. Plaintiff was eventually referred to Dr. Joseph King, an orthopedic surgeon. Dr. King diagnosed plaintiff with foraminal stenosis at L4-5 with broad-based disk protrusions and right paracentral disk herniations at L4-5 and L5-S1. On August 13, 2002, Dr. King performed a laminectomy at L5-S1.
9. Plaintiff did well for a short time following the surgery, but then his leg numbness, radiculopathy, and pain returned. Dr. King released plaintiff on May 5, 2003 with a five percent disability rating to the back and a referral to pain management.
10. Plaintiff received pain management treatment from Dr. Ade Akande, a board-certified internist, anesthesiologist and pain specialist at Charlotte Pain Associates. Dr. Akande diagnosed plaintiff with post-lumbar laminectomy syndrome with left greater than right radiculopathy, lumbar facet arthropathy and facet syndrome, and failed back surgery syndrome. Dr. Akande recommended continued medication management using stronger narcotics and injections. Dr. Akande suggested that plaintiff would require additional back surgery.
11. Plaintiff last saw Dr. Akande on February 9, 2004. At that time, Dr. Akande did not release plaintiff from his care and planned to continue pain medication management and try different types of pain intervention. Although Dr. Akande did not address return-to-work issues, he stated at his deposition that plaintiff could not return to his pre-injury job with defendant-employer and would never be able to do any work involving heavy lifting. He also stated that plaintiff was unable to work during the time he treated plaintiff. Plaintiff had to cease treatment with Dr. Akande because his group health insurance expired. Plaintiff has not been able to afford necessary medical treatment since that time.
12. Dr. Akande testified and the Commission finds that plaintiff's current condition was caused by the February 18, 2002 injury at work and the subsequent failed back surgery. 13. On March 8, 2005, Dr. John Welshofer of Total Spine Specialists saw plaintiff for an independent medical examination. Dr. Welshofer diagnosed plaintiff with chronic discogenic back pain with intermittent sciatica. Dr. Welshofer testified that he would restrict plaintiff to sedentary employment, with restrictions of no lifting, pushing, pulling, or carrying anything over ten pounds, no stooping, squatting or kneeling, and changing positions frequently. Dr. Welshofer indicated that plaintiff was a potential candidate for a morphine pump or spinal cord stimulator for pain control. He stated that plaintiff needed a pain management psychologist and recommended plaintiff see Dr. Kern Carlton at the Rehab Center for ongoing pain management.
14. The medical evidence shows that plaintiff has significant deficits on both physical and neurological examination, including a positive straight leg raise test, diminished reflexes in the lower extremities, decreased sensation in the right foot in an L4-5 distribution, all of which are consistent with nerve root irritation from failed back surgery syndrome. An MRI taken in August 2003 confirmed plaintiff's disc herniations, post-surgical scar tissue, and facet joint swelling at the L5-S1 level. Dr. Akande anticipated that plaintiff could return to work with a ten-pound lifting restriction after he completed all the recommended pain management procedures that he cannot presently afford. Plaintiff has problems walking distances and sitting or standing for prolonged periods. He uses a cane to walk. Dr. Akande has restricted plaintiff from standing or walking more than ten minutes at a time.
15. In regard to plaintiff's continuing disability, the Commission gives greater weight to the expert opinions of Dr. Akande as the treating physician than to Dr. Welshofer, who saw plaintiff one time for an IME. Therefore, based on the greater weight of the medical evidence, the Commission finds that as the result of his compensable injury by accident, plaintiff was disabled and has been unable to return to his truck driver job or any other employment since April 5, 2002.
16. Graebel's business of interstate trucking and moving furniture was not independent or distinct from plaintiff's job as a truck driver who moved furniture. Graebel had numerous workers operating under the trip-lease agreements purporting to make its truck drivers independent contractors for purposes of workers' compensation coverage.
17. Plaintiff did not use any special skills in his job as a truck driver and furniture mover. Plaintiff had a commercial driver's license and the ability to drive a truck, which are not special skills.
18. Graebel did not withhold taxes from plaintiff's pay, but exercised considerable control over the method of payment. Plaintiff's earnings went directly to Graebel and were placed in an account that Graebel maintained for plaintiff. Before Graebel paid the money to plaintiff, Graebel frequently imposed fines on plaintiff and removed money from plaintiff's account for procedural or policy violations. Graebel called these fines "assessments" and controlled plaintiff's manner and method of work by imposing these assessments. Plaintiff testified that his account was fined several times for infractions, such as not putting a number on a weight ticket and not filling out inventory forms in the manner defendant-employer required. Plaintiff testified that these fines were taken "right out of your account." Plaintiff never received his earnings before these amounts were removed. Graebel also fined drivers for involvement in traffic accidents that were their fault.
19. Graebel had considerable control over plaintiff's work schedule and could terminate or suspend his employment. Between December 1999 and February 2002, plaintiff worked for Graebel on a full-time, regular and exclusive basis. Plaintiff was not able to select his own time of work. Plaintiff received work assignments from a dispatcher in Atlanta and the dispatcher gave plaintiff the location and time details of the jobs assigned. Plaintiff testified that if a driver was late for a job, "they'll let you sit; you don't work" and "if you're not on time and you do that a couple times, they'll fire you." Plaintiff testified that if a driver turned down a moving job assignment, that driver was prevented from working for a period of time. On one occasion, plaintiff refused a moving job assigned by Graebel because, in plaintiff's judgment, the job did not pay enough money for what he had to spend on it. As the result of this refusal, Graebel deprived plaintiff of moving jobs for three weeks. With this policy, Graebel maintained control over drivers by effectively requiring them to take and complete all assignments.
20. Graebel held plaintiff out to the public as an employee. Plaintiff's truck was required to display Graebel's ICC license number and tags. Furthermore, Graebel required drivers' trucks to display conspicuous signs bearing "Graebel Van Lines" or "Graebel." Graebel installed the sticker-signs on the drivers' trucks, and drivers were forbidden by contract to do any other work with their truck unless all of Graebel's signs were covered. Because covering all of these required signs was not feasible, plaintiff was effectively barred from earning wages or working for any employer other than Graebel. Plaintiff also had to wear clothing with Graebel's name on it, identifying him as Graebel's agent, and had to comply with Graebel's dress code.
21. Plaintiff did not have full control over his assistants. Plaintiff testified that if the load to be moved weighed over 10,000 pounds, "[Graebel] would tell you how many men you needed to have on that job at the time." Plaintiff's helpers had to be approved by Graebel. If plaintiff could not drive a load due to illness or any other reason, plaintiff could not hire a driver for that job. Graebel arranged for a substitute driver in that case. Furthermore, a driver had to be "Graebel-certified" to drive a load for Graebel.
22. Plaintiff received from Graebel specific instructions how to complete his work tasks. For example, plaintiff attended a three-day training session put on by Graebel that provided instructions regarding filling out the drivers' logs in the way Graebel required and the proper way to load and unload a truck, as well as how to pack dishes. If plaintiff did not follow these instructions, he could be fined, penalized or terminated.
23. Pursuant to the trip lease agreement and the course and scope of the dealings between the parties, Graebel maintained sufficient control over plaintiff and the tasks he performed to constitute an employment relationship.
24. On February 18, 2002, plaintiff sustained an injury by accident arising out of and in the course of his employment with Graebel. At the time of his injury by accident, plaintiff was an employee of Graebel as shown by the following: the business of defendant-employer was not independent or distinct from plaintiff's job as a truck driver; plaintiff did not use any specialized skills in his job; defendant-employer exercised considerable control over the method of payment to plaintiff and over plaintiff's work schedule; plaintiff worked for defendant-employer on a full-time, regular and exclusive basis; defendant-employer held plaintiff out to the public as an employee by requiring the truck to display defendant-employer's name, ICC license number and tags, and by requiring plaintiff to wear clothing with defendant-employer's name on it; plaintiff did not have full control over assistants; plaintiff received specific instructions how to complete his work tasks and if he did not follow these instructions, he could be fined or terminated; defendant-employer controlled plaintiff's work schedule and could terminate or suspend plaintiff's employment if he was late for pickup or delivery.
25. Because plaintiff reported income based on his gross earnings and expenses, the first method of calculating his average weekly wage under N.C. Gen. Stat. § 97-2(5) is not accurate and fair. Also, methods two through four are inapplicable. The use of the fifth method of calculation is fair and just to both parties.
26. Pursuant to the fifth method of calculation articulated in N.C. Gen. Stat. § 97-2(5) to "most nearly approximate the amount which the injured employee would be earning were it not for the injury," plaintiff's average weekly wage is best ascertained by considering his net income in the weeks he worked in 2002 before his injury. Plaintiff worked 12 3/7ths weeks in 2002 before going out of work on April 5, 2002. According to his tax return, plaintiff's net income for this period was $10,602, which divided by 12 3/7 yields $853.00 per week. A wage of $853.00 per week results in a weekly compensation rate of $562.98.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An injured person is entitled to workers' compensation benefits under the North Carolina Workers' Compensation Act only if he is an employee of the party from whom compensation is sought. Barber v. Going West Transp., Inc., 134 N.C. App. 428,517 S.E.2d 914 (1999); Williams v. ARL, Inc.,133 N.C. App. 625, 516 S.E.2d 187 (1999).
2. Here, the contract between Graebel and plaintiff provided that plaintiff was an independent contractor. However, the actual relationship between the parties is determinative, not how the parties may have designated their relationship. Youngblood v.North State Ford Truck Sales, 321 N.C. 380, 364 S.E.2d 433
(1988); Williams v. ARL, Inc., supra. In Hayes v. ElonCollege, 224 N.C. 11, 29 S.E.2d 137 (1944), the North Carolina Supreme Court held that the dominant indicator in the determination of whether a worker is an independent contractor or an employee is whether the employer has authority to control how the worker accomplishes the tasks to be completed. Id. The Court stated that while no one factor is controlling and the presence of all factors is not required, the eight factors to be considered when deciding the degree of control exercised by an employer in each situation include whether:
 The person employed (a) is engaged in an independent business, calling or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time. Id. at 16, 29 S.E.2d at 140.
3. Applying the Hayes analysis to the facts in this case, defendant-employer exercised sufficient control over the way plaintiff accomplished the work tasks to be completed such that an employment relationship was established. Hayes v. ElonCollege, supra. Further, the nature and goal of plaintiff's actions at the time of his injury were reasonably related to his employment. N.C. Gen. Stat. § 97-2(2); Hoffman v. Truck Lines,306 N.C. 502, 293 S.E.2d 807 (1982). In addition, pursuant to the law in effect at the time of plaintiff's injury by accident, an owner-driver operating a truck in interstate commerce under the license tags and authority granted to a trucking company by the ICC was deemed an employee of the trucking company. Brown v.Truck Lines, 227 N.C. 299, 42 S.E.2d 71 (1947).
4. On February 18, 2002, plaintiff sustained an injury to his back as a result of a specific traumatic incident of the work assigned that arose out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
5. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v.Perdue Farms, Inc., supra.
6. In the present case, plaintiff met his burden by producing medical evidence to show that he is physically, because of the work-related injury, incapable of work in any employment. Demeryv. Perdue Farms, Inc., supra. As a result of the February 18, 2002 compensable specific traumatic incident, plaintiff is disabled from work and is entitled to receive compensation for temporary total disability at the rate of $562.98 per week beginning April 5, 2002 and continuing until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. §§97-2(6); 97-29.
7. As a result of the February 18, 2002 compensable specific traumatic incident, plaintiff is entitled to have defendants pay for medical care reasonably necessary to effect a cure, give relief, or lessen the period of disability. N.C. Gen. Stat. §97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay plaintiff temporary total disability compensation at the rate of $562.98 per week beginning April 5, 2002 and continuing until plaintiff returns to work or until further Order of the Commission. Amounts that have accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury on February 18, 2002.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel. Of the accrued amount, 25% shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This 5th day of May 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ THOMAS J. BOLCH COMMISSIONER