* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of parties. *Page 2 
3. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
4. The employment relationship existed between plaintiff and defendant-employer on March 2, 2005.
5. Acordia Employers Service is the insurance carrier on the risk.
6. Had plaintiff been permitted to return to work for defendant-employer, he would have received the same wage he received prior to his injury, regardless of the capacity in which he returned to work.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years old. Plaintiff graduated from high school. Plaintiff worked for defendant-employer for approximately 29 years, the last several years as a lineman.
2. On March 2, 2005, plaintiff and a co-worker, Lester Debreaux, loaded power line poles on a trailer and drove them to a work site. At approximately 10:00 a.m., plaintiff and Mr. Debreaux were preparing to manually unload the poles with plaintiff standing at one end of the trailer and Mr. Debreaux at the other. Plaintiff and Mr. Debreaux unstrapped a pole and started to roll the pole off the trailer. While rolling the pole off the trailer, another pole shifted and smashed the end of plaintiff's little finger. *Page 3 
3. Another co-worker, Ernest Green took plaintiff to Southampton Memorial Hospital in Franklin, Virginia. Mr. Green drove plaintiff to the hospital's emergency department door and returned to the job site.
4. Plaintiff's supervisor, Matt Rawls, met plaintiff in the waiting area of the emergency department where they sat and talked about the accident. Plaintiff received treatment for his finger.
5. Robert Foster, construction manager with defendant-employer, drove to the hospital on the day of plaintiff's accident and met with and talked to plaintiff and Mr. Rawls in the waiting area. Mr. Foster did not suspect plaintiff of being intoxicated in any way.
6. Just after Mr. Foster arrived at the hospital, plaintiff underwent a Breathalyzer test, which was negative. A nurse then directed plaintiff into a restroom, put blue dye in the toilet and handed plaintiff a collection container with a temperature strip. Plaintiff returned a filled container to the nurse at the counter, where she put the urine into two containers and secured them. Plaintiff was then examined by a physician and instructed to be at Obici Hospital to see a specialist at approximately 5:00 p.m. that evening. Thereafter, plaintiff and Mr. Rawls drove back to the job site.
7. Mr. Rawls drove plaintiff to Obici Hospital for treatment that evening. Plaintiff saw Dr. Jeffery Persons in the emergency department. Dr. Persons amputated the end of plaintiff's little finger to the first or DIP joint.
8. The following day, plaintiff returned to work at his full pre-injury wage. Defendant-employer provided him with modified work at that time. It is defendant-employer's policy to provide an employee with modified duty work until the employee receives permanent work *Page 4 
restrictions. Once an employee has received permanent work restrictions, defendant-employer attempts to find work within the company that falls within the restrictions.
9. Quest Diagnostics performed validity tests on one of the two containers of plaintiff's urine sample. These tests showed the level of creatinine in plaintiff's urine to be below the detection level of Quest's equipment and a specific gravity of 1.0002. Based on scientifically accepted methods of analysis, such results indicate a substituted sample.
10. In order to be certain that there were no testing errors, the second container of plaintiff's urine sample was sent to a separate laboratory, Drug Scan, for analysis to determine the creatinine concentration and the specific gravity characteristic of plaintiff's urine sample. The results of this analysis showed a creatinine level of 0.4 milligrams per deciliter of the sample and a specific gravity of 1.0002. Dr. Richard Cohn, an expert in the field of forensic toxicology and a forensic toxicologist with Drug Scan, testified that the normal range of creatinine in human urine is 100 to 200 milligrams per deciliter. Dr. Cohn further testified to a reasonable degree of medical certainty that the sample submitted by plaintiff was a substituted urine sample based upon the low level of creatinine and the fact that the specific gravity of plaintiff's sample was less than 1.0010. Dr. Cohn further testified that no one could void a urine specimen with the physiological characteristics of plaintiff's sample.
11. Plaintiff went to his family physician, Dr. Colin Jones, on June 1, 2005 to determine whether a renal problem could have caused the above-mentioned drug screen results. Dr. Jones consulted with Dr. Jeffrey Hoggard, a nephrologist, who indicated that he was not aware of any physiological way that a urine's specific gravity could be as low as reported on plaintiff's drug screen. *Page 5 
12. Defendant-employer maintains a fitness for duty policy under which an employee will be terminated for refusal to submit a valid urine sample for testing. Mr. Foster testified that plaintiff's substituted sample was considered a refusal to submit a valid urine sample for testing.
13. As a result of his invalid sample, plaintiff was terminated from his employment with defendant-employer on March 8, 2005. Mr. Foster testified and the Full Commission finds that plaintiff's termination was unrelated to the compensable injury and a non-disabled employee would have been terminated for the same conduct. The parties stipulated and the Full Commission finds as fact that had plaintiff been permitted to continue to work for employer-defendant, he would have received the same wage he earned prior to his injury regardless of the capacity in which he returned to work.
14. Plaintiff treated with Dr. Persons on March 10, 2005 at which time Dr. Persons filled out a form stating that plaintiff could do modified duty work. On March 24, 2005, Dr. Persons recommended plaintiff attend occupational therapy three times a week for three weeks to work on desensitization as well as a Coban wrapping for contouring of the finger. Thereafter, plaintiff did not attend his next scheduled appointment and has not followed-up with Dr. Persons. Dr. Persons testified that it would be speculation at this point as to any work restrictions plaintiff might have.
15. In late April and May of 2005, plaintiff began looking for work. Plaintiff testified that he talked to about twenty people whom he was unable to identify about the possibility of work and filled out two job applications. In June of 2005, plaintiff found a job through a friend as a millwright earning $13.00 per hour and worked on average 30 hours per week. Plaintiff was released from this job in September 2005. *Page 6 
16. After being released from his millwright job in September 2005, plaintiff's only other work search consisted of applying for a position at an electrical operating company and inquiring about work with a local building contractor who did not have any openings.
17. Plaintiff testified he continues to suffer pain and discomfort in his fingers and a loss of strength in his hand. Plaintiff further testified that he thought additional medical treatment would help him.
18. Based on the Form 22, plaintiff's average weekly wage, based on the 52 weeks preceding the accident, was $1,282.93 per week, yielding a maximum compensation rate of $704.00 per week.
19. On June 30, 2006, the Executive Secretary consolidated IC File Number 515848 under IC File Number 508720, for the purpose of hearing.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On March 2, 2005, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's average weekly wage was $1282.93 per week, yielding a maximum compensation rate of $704.00 per week.
3. Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination on March 8, 2005 constitutes a *Page 7 
constructive refusal to perform the work provided. Seagraves v. AustinCo. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996).
4. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that his inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. Austin Co. of Greensboro,supra.
5. In the case at bar, the greater weight of the evidence shows that after his termination plaintiff was capable of some work, that it would not have been futile for him to look for work due to pre-existing conditions, and that plaintiff did not make a reasonable effort to find other employment. Demery v. Perdue Farms, Inc., 142 N.C. App. 259,545 S.E.2d 485 (2001). Therefore plaintiff has failed to prove that he was disabled from employment due to the compensable injury and is not entitled to any compensation. N.C. Gen. Stat. § 97-29; Seagraves v.Austin Co. of Greensboro, supra.
6. Plaintiff is entitled to have defendants pay for past and future medical expenses incurred as a result of the compensable injury as are required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-25.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD 1. Plaintiff is not entitled to temporary total disability benefits. *Page 8 
2. Defendants shall pay for past and future medical expenses incurred as a result of the compensable injury as are required to provide relief, effect a cure, or lessen the period of disability as recommended by plaintiff's treating physician, Dr. Persons.
3. Defendants shall pay the costs.
This the 12th day of February 2007.
S/____________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/____________________ PAMELA T. YOUNG COMMISSIONER