* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner. *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On June 21, 2004, the parties were subject to and bound by the provisions in the North Carolina Workers' Compensation Act.
2. On June 21, 2004, an employer-employee relationship existed between plaintiff and defendant-employer.
3. On June 21, 2004, defendant-employer employed three or more employees.
4. On June 21, 2004, St. Paul Travelers was the carrier on the risk.
5. Defendants admit that plaintiff sustained an injury by accident on June 21, 2004, but deny that any medical expenses incurred subsequent to June 28, 2004 are a proximate result of the compensable injury.
6. Defendants paid plaintiff's medical expenses in the amount of $1,136.17 in connection with medical treatment incurred as a result of the compensable June 21, 2004 injury.
7. Plaintiff's average weekly wage is $510.52, yielding a compensation rate of $340.35 per week.
8. On September 19, 2004, plaintiff underwent surgery performed by Dr. Estrada Bernard, consisting of secondary right frontal parietal craniotomy for evacuation of acute subdural hematoma.
9. On September 21, 2004, plaintiff underwent a second surgery performed by Dr. Bernard, consisting of placement of left frontal ventriculostomy.
10. In addition, the parties stipulated into evidence the following at the Deputy Commissioner's hearing: *Page 3 
 a. Five pages of photographs
 b. Income tax returns for 2003 and 2004
 c. Packet of Industrial Commission Forms submitted February 14, 2006
 d. 1,575 pages of medical records and reports submitted February 28, 2007
11. The Pre-Trial Agreement dated November 17, 2006, which was submitted by the parties, is incorporated by reference.
12. The issues before the Full Commission are whether plaintiff's June 21, 2004 injury by accident caused his subdural hematoma; whether plaintiff is entitled to total disability benefits after September 18, 2004; whether plaintiff requires supervision and/or attendant care since his discharge from a rehabilitation facility on November 23, 2004; and whether plaintiff's wife is entitled to compensation for attendant care she provided plaintiff beginning November 23, 2004.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was fifty-two years old and was born in Mexico, where he completed only an elementary school education. He moved to the United States when he was in his twenties and by 2004, plaintiff was able to speak English well enough to communicate satisfactorily at work. In 2003, he began working for defendant-employer, a commercial hog producer, loading pigs into trucks. James Thomas Murphy was his supervisor.
2. On June 21, 2004, plaintiff was working at the Butler farm with the rest of Mr. Murphy's loading crew. There was a chute built into the side of the barn which was used to get *Page 4 
the pigs from the barn into the truck. The outer end of the chute had to be raised to the level of the truck by using an overhead block and tackle type of hoist.
3. Since the chain for the hoist was too high to reach while standing in the chute, plaintiff climbed up onto the sides of the chute, which were four feet high. While standing with one foot on each side, he reached up to grab the bar from which the chute was suspended. The motion disturbed wasps which flew out from the bar. In order to get away from the wasps, plaintiff dropped down to the floor of the chute. Before he landed, however, his head struck the angle iron which ran along the top of the side of the chute. The impact was so loud that Mr. Murphy heard it, but plaintiff did not lose consciousness. The blow caused a deep laceration above the bridge of his nose which bled profusely. Mr. Murphy administered first aid and called his supervisor, who contacted the safety officer and drove out to the farm. Plaintiff did not want to go to a doctor but was ultimately persuaded to get medical attention, so he was taken to Clinton Urgent Care.
4. At Clinton Urgent Care, a physician's assistant examined plaintiff and found a 1 ¼ -centimeter deep gaping laceration across the bridge of his nose, which still had active bleeding. The laceration required five stitches. Plaintiff returned to work the next day and continued working in his regular job on the loading crew for about four more weeks. He was then promoted to lead person on the vaccination crew, a job which required him to prepare the medication in advance, administer the vaccine to the hogs and do paperwork showing which hogs had been vaccinated. His supervisors considered him to be a good, hard working employee and did not notice any difference in his work performance after the incident on June 21, 2004. During that time, plaintiff denied having any problems associated with his injury at work. Stitches were removed on June 28, 2004 and he received no further follow-up care. *Page 5 
5. At home, however, plaintiff began to complain of periodic headaches, which grew worse over time. Plaintiff slept more and was tired. On a couple of occasions, plaintiff forgot important matters, like picking up his daughter from school and attending a doctor's appointment. In addition, there were times that he did not seem to pay attention to traffic when driving. However, the symptoms did not get severe until September 17, 2004, when he told his wife that he felt as though his head was going to explode. Plaintiff went to Clinton Medical Clinic that day and told Dr. Gilbert Palmer that he had been having the pain for a week. Dr. Palmer was of the impression that the pain was coming from plaintiff's frontal sinuses, so he prescribed an antibiotic for a sinus infection.
6. On September 18, 2004, plaintiff did not wake to his alarm and his wife had difficulty waking him up. Later, when he went to leave for work, he started his car but sat in his vehicle for some time and did not drive away. That evening, plaintiff told his wife that he could not find their house and that he urinated on himself at work without noticing. His ability to walk was also visibly impaired. Plaintiff did not return to work after September 18, 2004.
7. Later on September 18, 2004, Mrs. Gutierrez became concerned and took plaintiff to the hospital where a CT scan showed a 2.5 centimeter subdural hematoma with severe mass effect on the brain that had a 14 millimeter midline shift towards the left side of the skull. Plaintiff was immediately transported to UNC Hospital where he was evaluated by the neurosurgery department and taken to surgery on an emergency basis. On September 19, 2004, Dr. Estrada Bernard and Dr. Ricardo Cortez performed a secondary right frontal parietal craniotomy for evacuation of the subdural hematoma. The hematoma was brownish "crank case oil" colored and appeared to be chronic and subacute. The hematoma had been present for so long that the brain did not expand back into the space the clot had occupied. *Page 6 
8. A repeat CT scan performed on September 19, 2004 also revealed that plaintiff had developed a recurrent acute subdural hematoma, which was a risk when the brain would not expand into the gap. Consequently, Dr. Bernard and Dr. Michaux Kilpatrick evacuated the new blood clot. After this second operation, plaintiff's condition remained quite serious and a subsequent CT scan showed that he suffered strokes. On September 21, 2004, Dr. Bernard performed a third operation to insert an intracranial monitor which allowed doctors to check plaintiff's spinal fluid pressure and to drain spinal fluid from the brain if the pressure became too high. Plaintiff subsequently regained consciousness, but had confusion and trouble swallowing, and a feeding tube was inserted into his stomach on September 27, 2004.
9. By October 7, 2004, plaintiff was discharged to Southeastern Regional Rehabilitation Center in Fayetteville. Plaintiff displayed impulsiveness, impaired cognition, the inability to follow directions, confusion and times of agitation, and had to be confined to a Vail bed with restraints. During the course of his stay at the rehabilitation facility, plaintiff was treated with occupational therapy, physical therapy, speech therapy, rehabilitation psychology and nursing services. Dr. Zane Walsh, who is board certified in physical medicine and rehabilitation and electrodiagnostic medicine, was plaintiff's primary treating physician. Plaintiff was also evaluated by psychiatrist Dr. Martinez, who diagnosed him with an organic personality disorder secondary to traumatic brain injury. Both doctors prescribed medications for plaintiff.
10. After almost seven weeks, Dr. Walsh determined that plaintiff reached his maximum benefit from the rehabilitation center. Plaintiff was still confused, with severe impairment in attention, concentration and reasoning, he was highly distractible and had incontinent episodes. Dr. Walsh recommended that plaintiff be admitted to a facility providing 24-hour supervision and care, but Mrs. Gutierrez did not want her husband sent to an institution *Page 7 
and thought that she and their family could provide the care plaintiff needed. Consequently, on November 23, 2004, Dr. Walsh discharged plaintiff to her care.
11. Mrs. Gutierrez worked at Bojangles 30 to 40 hours per week earning $7.95 per hour. After plaintiff was hospitalized in September 2004, Mrs. Gutierrez quit her job to look after her husband. Despite a regular toileting program, plaintiff was frequently incontinent and had to wear diapers, was irritable and impulsive, and had an unsteady gait and balance problems, in part due to visual disturbance associated with brain damage. Medications were prescribed to help control his symptoms, particularly plaintiff's anger. As part of the personality disorder associated with his brain injury, plaintiff had a compulsion to eat and it was very difficult for Mrs. Gutierrez to keep him on a diabetic diet.
12. When unsupervised, plaintiff was very impulsive and on at least one occasion, tried to leave the house intending to walk to a store, which he did not know how to find. On more than one occasion plaintiff attempted to leave the house at night when his family was asleep. Mrs. Gutierrez stated that plaintiff sleeps through the night because of sleep medications, but that she sometimes has to change him during the night. Plaintiff also sleeps frequently during the day. Mrs. Gutierrez felt that she could not leave plaintiff alone, except for a brief period in the morning when she drove their daughter to school. Plaintiff stayed in bed asleep during that time. The family home does not have an alarm system or beeper on the doors nor does plaintiff wear a wander bracelet, any of which would warn the family if plaintiff attempts to leave the premises.
13. Plaintiff was discharged from the neurosurgery department at UNC on March 1, 2005. Dr. Eldad Hadar evaluated him that day and ordered a follow-up CT scan. There was no further fluid collection in the area of the prior subdural hematoma but the test revealed a large *Page 8 
area of encephalomalacia in the right occipital lobe. Dr. Hadar concluded that plaintiff's persistent cognitive issues were consistent with encephalopathy from brain injury.
14. Dr. Walsh continued to see plaintiff periodically on an outpatient basis and plaintiff was also evaluated regularly by a psychiatrist, who prescribed medications. Plaintiff continued to exhibit poor insight, impulsivity, episodes of verbal and occasionally physical aggression, confusion, problems with his vision and incontinence of both bowel and bladder. Dr. Walsh also noted that plaintiff could not concentrate, had pressured speech, exhibited manic type behavior, had disorganized thoughts, severe memory problems and talked excessively. Dr. Walsh was of the opinion that plaintiff would continue to require 24-hour per day supervision, that his condition will never improve and that plaintiff will never be able to return to work.
15. Dr. E. Hunter Dyer, a board certified neurosurgeon, reviewed plaintiff's medical records from UNC Hospitals to form an opinion on the causation of plaintiff's subdural hematoma. Dr. Dyer did not review plaintiff's CT scan. Dr. Dyer testified that more likely than not plaintiff's injury on June 21, 2004 caused his subdural hematoma, based on the operative reports and the presence of crankcase-type fluid in plaintiff's brain. In addition, he felt the description of the laceration plaintiff suffered on June 21, 2004 was likely sufficient to cause a subdural hematoma. Plaintiff's 14 millimeter midline shift was large and would have built up gradually over time, and ultimately caused the subdural hematoma. Dr. Dyer described plaintiff's blood clot as chronic, meaning it had been there for several weeks, and that the fact plaintiff's brain did not return to its original shape after the clot was evacuated also reflects that the clot was present for a long time.
16. Defendants requested that Dr. O. Del Curling, a board certified neurosurgeon, also review plaintiff's medical records and CT scan to render an opinion on the cause of plaintiff's *Page 9 
subdural hematoma. Dr. Curling testified that it was possible that plaintiff's intracranial hemorrhage developed as a result of the June 21, 2004 injury by accident, but that it could have "developed in association with any even potentially minor (and perhaps unrecognized) head trauma" from June 21, 2004 until September 18, 2004. Dr. Curling felt the injury that caused plaintiff's subdural hematoma was more likely caused weeks and not months prior to September 18, 2004. Dr. Curling explained that the presence of blood with the color of "crank case oil" did not necessarily provide a date of injury. He stated that if the blood was pinkish, as opposed to dark brown or black in color, it would have been fresher. And, as the operative report failed to describe how dark the blood appeared, he could not say how old it was. Based on the CT scan and the lack of neurologic symptoms in plaintiff's medical records between June 21, 2004 and September 18, 2004, Dr. Curling opined that the head trauma which caused plaintiff's subdural hematoma took place approximately three weeks prior to the appearance of the hematoma.
17. Dr. J. Paul Muizelaar, a neurosurgeon, also reviewed plaintiff's medical records. Dr. Muizelaar testified that it is unusual for an individual to have a subdural hematoma of this size without having head trauma. He testified that he was certain that the accident on June 21, 2004 caused the development of plaintiff's subdural hematoma. Dr. Muizelaar stated that the blood found during plaintiff's surgery was brownish and therefore was older blood.
18. Dr. Patricia Gross is a neuropsychologist who was hired by defendants to evaluate plaintiff. Dr. Gross testified that plaintiff's cognitive abilities were severely impaired and she agreed that plaintiff should have 24-hour supervision following his discharge from the hospital and that his condition was not likely to improve.
19. Laura Weiss, a certified life care planner and registered nurse, performed an assessment of plaintiff's attendant care needs and determined that he should have someone with *Page 10 
certified nursing assistant (CNA) level training because of his incontinence and need for hands-on assistance. However, the attendant would need to be capable of handling volatile situations because of plaintiff's potential for being a danger to himself and others. In addition, Ms. Weiss found that plaintiff demonstrated inappropriate behavior towards women in a neuropsychological evaluation. Consequently, Ms. Weiss recommended a male, Spanish-speaking CNA as the most appropriate candidate. Ms. Weiss testified that a home health care agency would charge $17.00 to $20.00 per hour to provide a CNA to care for plaintiff. She further noted that Mrs. Gutierrez was close to a state of burnout at the time of the assessment.
20. The greater weight of the medical evidence establishes that subdural hematomas are usually the result of head trauma or of such rapid acceleration and deceleration of the brain that the brain pulls away from part of the skull. In addition, subdural hematomas can start small, causing no noticeable symptoms, and gradually grow until the brain is no longer able to adapt to the increased pressure, at which point the patient exhibits headache and serious neurological symptoms, such as confusion, incontinence and ataxia. During the interim period before a patient's symptoms become serious, the patient can have no symptoms or such subtle symptoms that they would not be recognized by a layperson or even by a doctor not trained in neurology or neurosurgery. In addition, the medical evidence shows that the initial subdural hematoma plaintiff developed was so large that if it had developed suddenly, it would have killed him or placed him in a comatose state. Thus, the greater weight of the medical evidence suggests
that plaintiff's subdural hematoma was not recent and that it grew slowly, allowing his brain to adapt both to the pressure and the significant shift in position until the clot reached an intolerable size. *Page 11 
21. Plaintiff had no other known head injuries between June 21, 2004 and September 17, 2004. During that period, plaintiff exhibited subtle signs consistent with neurological problems from a subdural hematoma that had not reached the "critical mass" size necessary to cause serious impairment. Thus, the Commission gives greater weight to Dr. Dyer and Dr. Muizelaar and finds that plaintiff's subdural hematoma was the proximate result of the injury by accident he sustained at work on June 21, 2004. In addition, the subdural hematoma caused plaintiff's brain injury, which led to persistent cognitive deficit, gait disturbance, visual field problems and an organic personality disorder.
22. Since September 19, 2004, plaintiff has been unable to work in any capacity due to the June 21, 2004 injury by accident and resulting brain injury. He has remained disabled and is never expected to be able to return to work. Plaintiff reached maximum medical improvement 18 to 24 months after his surgery.
23. Plaintiff requires ongoing medical monitoring and treatment. Plaintiff is unable to control his impulses, and suffers from incontinence, poor judgment, risks wandering away from home, and engages in volatile and inappropriate behavior. However, plaintiff is able to eat on his own, water the lawn, and talk on the telephone. Dr. Walsh testified that after his stay in the rehabilitation facility, plaintiff was capable of feeding himself and performing the basic activities of daily living. Mrs. Gutierrez testified that plaintiff normally goes to bed between 9:00 and 10:00 p.m., and that he wakes at approximately 7:00 a.m. Thus, it is often unnecessary to provide plaintiff attendant care during the hours he is sleeping. In addition, there are periods during the day when plaintiff does not need direct care or supervision. Therefore, the Commission finds that Mrs. Gutierrez provides attendant care to plaintiff an average of 16 hours per day. The Commission finds that plaintiff requires supervision and attendant care for 16 hours per day, *Page 12 
beginning November 23, 2004, and that plaintiff is expected to require this care for the remainder of his life. Mrs. Gutierrez has provided this care from November 23, 2004 until the date of the Deputy Commissioner's hearing and continuing, and she is entitled to payment for her time. The compensation paid to Mrs. Gutierrez should be at a rate that takes into consideration the rate charged by professional home health care agencies and the fact that Mrs. Gutierrez is not a professional and is an unskilled care provider without any business overhead. Accordingly, the Commission finds that a fair rate for the unskilled care provided by Mrs. Gutierrez is $10.00 per hour for 16 hours per day, seven days per week.
24. The Commission finds that plaintiff is not capable of managing his workers' compensation benefits.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 21, 2004, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. The subdural hematoma for which plaintiff was treated beginning on September 18, 2004 was a proximate result of his injury by accident at work on June 21, 2004. N.C. Gen. Stat. § 97-2(6); Holley v. ACTS,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Click v. Freight Carriers,Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
3. In order to be found permanently and totally disabled, a plaintiff must produce competent medical evidence that he is not able to perform gainful employment of any kind. Demery v. Perdue Farms, Inc.,142 N.C. App. 259, 545 S.E.2d 485 (2001). *Page 13 
4. As a result of his admittedly compensable June 21, 2004 injury by accident, plaintiff is permanently totally disabled from any employment and is entitled to receive permanent total disability compensation at a rate of $340.35 per week beginning September 19, 2004 and continuing for the remainder of his life. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to payment by defendants of all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
6. In the case at bar, plaintiff is able to perform some functions on his own, but requires attendant or supervisory care an average of 16 hours per day. Such care was and continues to be necessary to provide relief to plaintiff. Plaintiff's wife has provided plaintiff unskilled attendant or supervisory care services since November 23, 2004. Chapter 14 of the Workers' Compensation Medical Fee Schedule allows approval of past family attendant care in "unusual cases where the treating physician certifies it is required. . . ." In this case, Dr. Walsh, as well as Ms. Weiss, recommended daily attendant care for plaintiff, seven days per week.
7. Therefore, plaintiff is entitled to payment of attendant care for 16 hours per day, seven days per week, beginning November 23, 2004 and continuing until further order of the Commission. N.C. Gen. Stat. §97-2(19); London v. Snak Time Catering, 136 N.C. App. 473,525 S.E.2d 203 (2000). Since November 23, 2004, plaintiff's wife has provided unskilled attendant care for plaintiff for an average of 16 hours per day, seven days per week and she should be compensated at the reasonable rate of $10.00 per hour. In the event that the attendant care is provided by a CNA, these services shall be paid for by defendants at the going market rate for professional home health care. N.C. Gen. Stat. § 97-2(19). *Page 14 
8. In that plaintiff does not have the capacity to manage the workers' compensation benefits due to him, any workers' compensation benefits due plaintiff should be paid to a general guardian or to a suitable person designated by the Clerk of Court. See Hand v. Fieldcrest Mills,Inc., 85 N.C. App. 372, 355 S.E.2d 141 (1987).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved below, defendants shall pay to a general guardian, or to another suitable person designated by a Clerk of Court, compensation for the use and benefit of plaintiff for total disability at the rate of $340.35 per week for the period from September 19, 2004 and continuing for the remainder of his lifetime, barring a change of condition. That portion of this compensation which has accrued shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his injury by accident, including those arising from necessary future medical treatment and from past and future attendant care, which is to be provided 16 hours per day, 7 days per week. Defendants shall pay Ms. Gutierrez $10.00 per hour for plaintiff's attendant care for 16 hours per day, seven days per week, beginning November 23, 2004 and continuing until further order of the Commission or until the parties agree that the attendant care or a portion thereof shall be provided by a professional home health care agency. Defendants shall provide an alarm system or beeper on the doors, a wander bracelet, or other monitoring system to prevent plaintiff from leaving his home at night. *Page 15 
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay an expert witness fee in the amount of $330.00 to Ms. Weiss, if not already paid.
5. Defendants shall pay the costs.
This 28th day of February, 2008. S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________________ PAMELA T. YOUNG CHAIR
S/______________________ *Page 16 
DANNY LEE McDONALD COMMISSIONER *Page 1